0001

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

---

ELAINE L. CHAO, Secretary of Labor,
United States Department of Labor,

Plaintiff,

vs. File No. 01-CV2374

GENERAL MAINTENANCE & FLOOR
SERVICE, INC., a corporation,
MICHAEL BAKRI, individually, and
d/b/a GENERAL MAINTENANCE,

Defendants.

---

DEPOSITION OF

MICHAEL BAKRI

Taken April 28, 2003
Commencing at 1:02 PM

COPY

REPORTED BY: ELIZABETH J. GANGL, RPR

PARADIGM REPORTING & CAPTIONING INC.
1400 RAND TOWER, 527 MARQUETTE AVENUE SOUTH
MINNEAPOLIS, MINNESOTA 55402-1331
612/339-0545 * 1/800/545-9668 * Fax: 612/339-5575

SHEET 2 PAGE 2

0002

Deposition of MICHAEL BAKRI taken on the 28th day of April 2003, commencing at 1:02 p.m., at the Minneapolis District Office of the Wage & Hour Division, United States Department of Labor, Tritech Office Center, Suite 920, 331 Second Avenue South, Minneapolis, Minnesota, before Elizabeth J. Gangl, Registered Professional Reporter and Notary Public of and for the State of Minnesota.

***********

APPEARANCES

On Behalf of the Plaintiff:

LEONARD A. GROSSMAN, ESQ.
Office of the Solicitor
U.S. Department of Labor
230 South Dearborn Street
Room 844
Chicago, Illinois 60604
312-353-5709

ALSO PRESENT: Kristin Tout-Nava

NOTE: The original deposition transcript will be delivered to Leonard A. Grossman, Esq. as the taking party of the deposition.

PAGE 3

0003

INDEX

WITNESS: MICHAEL BAKRI Page

EXAMINATION BY MR. GROSSMAN .................... 6

DOCUMENT PRODUCTION REQUESTS ........... 79, 80, 165

BAKRI EXHIBITS MARKED AND REFERRED TO:
(Bates numbers in parentheses)

1 Notice of Deposition ....................... 7

2 Plaintiff's First Set of Interrogatories and Request for Production of Documents ......... 8

3 Complaint .................................. 42

4 Answer to Complaint ..................... 42

5 Declaration of Investigator in Support of Plaintiff's Motion for Judgement by Default 47

6 Articles of Incorporation (C1, C1-a) ...... 81

7 Employee Information (D-3a:3b) .......... 82

8 List of Employees (D-4) ..................... 83

9 Copies of social security cards and identification cards (D-5a:5p) ............. 85

10 Acknowledgement of Independent Contractor (D-6) ................................... 88

11 7/26/01 letter to Kristin Tout from Ron Slone and attached Subcontractor/Store Task Sheets (C-3, C-4a:4s) ............ 87, 107

PAGE 4

0004

BAKRI EXHIBITS MARKED (Continued):

12 Subcontractor Agreement (C-5a:5c) ......... 94

13 Undated memo to ICM from Michael Bakri with Subcontractor Data Sheet and Request for Taxpayer Identification Number and Certification (C-6a:6b, 6d) ..... ......... 96

14 Checks and Invoices between ICM and Michael Bakri (C-7a:7e, C-8a:8f, C-9a:9g, C-10a:10g, C-11a:11k, C-12a:12j, C-13a:13h, C-14a:14d, C-15a:15h, C-16a:16l, C-17a:17d ...... 101

15 6/25/01 memo to all subcontractors from ICM re. New Subcontractor Contract (C-18a:18e) ............................ 110

16 7/16/98 letter to Michael Bakri from Roy Biles with attachments (C-19b:19f) ........ 112

17 HiTech duties, excerpts (C-20) ............. 115

18 List of store addresses and managers (C-21) . 115

19 HiTech invoices (C-24a:24c) ............ 118

20 List of employees and addresses .......... 120

21 11/27/00 notice to all contractors from Frank Dies, HiTech .............. ...... 122

22 List of payments made on 1/5/01 and 12/24/00 123

23 Western Union Money Transfer receipts ....... 125

24 List of employees and pay ............... 127

25 Floor Care Service Sign In/Out Log ..... 127

26 List of employees, days worked and pay received ............................ 133

27 AmeriGas invoice ........................ 135

28 Notebook maintained by Concepcion Parral, driver - Minnesota (A-12) ............ 136

PAGE 5

0005

BAKRI EXHIBITS MARKED (Continued):

29 Checks to various entities from General Maintenance & Floor Service A-11a:11i) .. 137

30 Western Union Money Transfer receipts (A-7a:7g) .............................. 140

31 List of employees (A-8a:8d, A-9a:9c, A-10a:10k) ............................ 140

32 Checks to various employees from General Maintenance & Floor Service (A-4a:4ao, A-5a:5m, A-6a:6c) .............. 143

33 Checks and money orders to various employees from General Maintenance & Floor Service (B-2c, B-2f) ...................... 148

34 Employee log ............................ 151

35 Checks and money orders to various employees from General Maintenance & Floor Service (B-21c, B-21f:21i) ............ 152

36 Checks to various employees from General Maintenance & Floor Service (B-24b) ........ 154

(Original exhibits in the possession of Leonard Grossman; no copies attached to transcript.)

SHEET 3 PAGE 6

0006

MICHAEL BAKRI,
duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. GROSSMAN:
Q. All right, Mr. Bakri, would you state and spell your name for the record?
A. Michael Bakri, B-A-K-R-I.
Q. And, Mr. Bakri, how are you currently employed?
A. I'm not working at this time.
Q. Let me go back a bit. Have you ever had your deposition taken before?
A. A few times I think, ten years ago.
Q. What kind of a matter was that?
A. It was a boat, insurance company filing claim.
Q. So you're familiar with the process?
A. Little bit.
Q. We'll ask you questions and you have to answer yes or no because the reporter can't record the nod of your head or something like that.
A. Sure.
Q. I'm going to ask you questions, and if you don't understand the question please let me know, because otherwise we'll assume you understood it.

PAGE 7

0007

A. Okay.
Q. If something isn't clear, ask me to make it clear.
A. Sure.
Q. I show you what we'll mark as Exhibit 1.
(Bakri Deposition Exhibit No. 1 marked for identification.)
Q. You did not receive a package in the mail from me on Friday FedEx?
A. No, I did not.
Q. So this is the Notice of Deposition. This deposition is being taken by notice and by agreement of parties. We agreed to take the deposition today, is that correct?
A. Correct.
Q. One of the things that I asked in the notice is that you bring all documents required in the interrogatories that were due a couple of weeks ago. You did not bring anything with you today?
A. No, because I have the impression that you're going to give me an extension 45 days.
Q. You're not going to have a 45-day extension.
MR. GROSSMAN: Can we go off the record?
(Discussion held off the record.)

PAGE 8

0008

BY MR. GROSSMAN:
Q. So you haven't brought any documents with you today?
A. No.
Q. I'm going to go over the list of documents that we asked for, if I can find the list.
(Bakri Deposition Exhibit No. 2 marked for identification.)
Q. Mr. Bakri, take a look at Exhibit 2, please. Can you tell us what this is?
A. This is a lawsuit in total?
Q. These are the interrogatories that I served on you.
A. Okay.
Q. On April 13th.
A. Yes.
Q. Have you answered these interrogatories?
A. Not yet, no.
Q. When do you expect to have the responses?
A. As we discussed, in a few days.
Q. Okay. I'm going to go over some of the questions with you. Let me go over the second half, there's a request for documents. You haven't produced any of those documents yet, is that correct?
A. Let's see.

PAGE 9

0009

Q. Beginning on page 12.
A. Okay. I've got it.
Q. Request 1 was "Any and all written agreements between any of the defendants and HiTech Commercial Services."
A. There is none.
Q. There are none?
A. No.
Q. You never had any written agreements with them?
A. No, none.
Q. Everything was done orally?
A. Any written agreement between defendant. What do you mean by defendant?
Q. Defendant means either you or General Maintenance & Floor Service, Inc. or General Maintenance.
A. Okay, let's make this me or General Maintenance Service or the other party? There are three parties.
Q. Well, there's really, there's you doing business as General Maintenance, and then there's General Maintenance & Floor Service, Inc., that's the way the caption was named for the case.
A. I cannot give you any General Maintenance. I

SHEET 4 PAGE 10

0010

can give you Michael Bakri d/b/a General Maintenance.
Q. Who has the documents for General Maintenance, Inc.?
A. I think Hoteit.
Q. Would you spell that name for the court reporter, please?
A. H-O-T-E-I-T.
Q. And who is that?
A. She's the owner of the General Maintenance.
Q. Is she related to you?
A. She's my mother, yes.
Q. Where is she?
A. Overseas.
Q. Where overseas?
A. Lebanon.
Q. When did she leave for Lebanon?
A. 2000, I believe June 2000 or September 2000, something like that. I'm not sure.
Q. Did she take packages of documents with her when she went to Lebanon?
A. I don't know. I don't know.
Q. But you say you don't have any agreements with HiTech?
A. No, no. HiTech, I believe I have like nothing written, signed agreement. Just highlight

PAGE 11

0011

what is, this is in August 2008. I'm sorry, August 8, 2000.
Q. What year?
A. August 8, 2000, I have verbal agreement with HiTech to do some work in Louisiana.
Q. In Louisiana?
A. Yes, me, Michael Bakri, d/b/a General Maintenance.
Q. Did HiTech do any business with General Maintenance, Inc. before you?
A. Yes, I believe they did, yes.
Q. When I say General Maintenance, Inc., that's short for General Maintenance & Floor Service, Inc.
A. Correct.
Q. We're talking about the corporation?
A. Correct.
Q. Do you have any written agreements between General Maintenance, Inc. or yourself with any other firms providing services like those provided to HiTech?
A. Yes. January 28th, 2001.
Q. What's that?
A. That agreement between Michael Bakri and a company named ICM, Industrial Cleaning Management, or owned by Rug Doctor.

PAGE 12

0012

Q. Owned by who?
A. Rug, R-U-G, Rug Doctor.
Q. What's Rug Doctor?
A. It's a firm called Rug Doctor.
Q. And they own, what's the name of the firm?
A. ICM, Industrial Cleaning Management.
Q. And where were they located?
A. I think Knoxville.
Q. Knoxville, Tennessee?
A. Tennessee.
Q. Did you provide services for --
A. I provide services here in town for Rainbow Foods.
Q. For Rainbow Foods in Minneapolis area?
A. Correct.
Q. Did you provide any services in Tennessee?
A. No.
Q. In Louisiana?
A. No.
Q. Ever provide services in Louisiana?
A. For HiTech, yes.
Q. But not for --
A. No.
Q. Do you have any written agreements or contracts or subcontracts for any of the defendants

PAGE 13

0013

again with ICM to provide services to Rainbow Foods?
A. Yes.
Q. You have written agreements?
A. Correct.
Q. Will you provide those written agreements?
A. Yes, I will.
Q. And you will provide the ones with HiTech as well?
A. There is nothing with HiTech.
Q. There is nothing written with HiTech?
A. No.
Q. Do you have any canceled checks that were signed or cashed by Kevin Arango?
A. Yes, I provide the agency with a copy of them.
Q. We'll look at those later, and if you have any others you will tell us then?
A. Okay.
Q. Do you have any 1099s or W-2s for any of the employees or individuals that worked for either of the defendants between 1998 and the present?
A. '98, no. '99, no. 2000, yes, for HiTech. This is the only one, 2000, I have.
Q. Nothing for 2001?
A. No.

SHEET 5 PAGE 14

0014

Q. When did you stop doing business?
A. Depend. In Louisiana?
Q. Let's start with Louisiana.
A. Louisiana, December 2000.
Q. December of 2000 you stopped with --
A. With HiTech.
Q. That was Louisiana?
A. Correct.
Q. You didn't do any more work down in Louisiana then after that?
A. No.
Q. And what about in Minnesota?
A. Minnesota I ceased working July 23rd, 2001.
Q. So you will provide all the 1099s and W-2s that you have?
A. Yes, I will.
Q. And they will come with the rest of the material this week?
A. Yes.
Q. Will we have all the documents by the end of the week?
A. I am not positive, I will have to look for them.
Q. You were served these requests, I think you received it on April 17th.

PAGE 15

0015

A. I'm trying to request from the court to give me extension of 30 days.
Q. You can't -- I won't argue with that now.
A. One month was not enough to provide all this document.
Q. Where are the documents?
A. I have to look for them. I'm not sure.
Q. I mean in Minneapolis?
A. Yes.
Q. Where, in your home?
A. Yes.
Q. In the basement?
A. Correct.
Q. In boxes?
A. A lot of boxes. Lot of boxes.
Q. Are they in drawers in file cabinets?
A. No.
Q. Do you want to just produce all the boxes?
A. No.
Q. What else is in the same boxes with them?
A. I'm not sure. There's a lot of paperwork, piled from long time.
Q. Do you have payroll records reflecting all the payments you made both from Louisiana and --
A. Correct.

PAGE 16

0016

Q. -- and Minnesota?
A. Correct.
Q. Did you have operations in any states besides Louisiana and Minnesota?
A. No.
Q. When I say you, do you have any records from General Maintenance, Inc.?
A. No.
Q. They all cut off?
A. Correct.
Q. Not one piece of paper from General Maintenance, Inc.?
A. No.
Q. When did you stop doing, when did the papers stop from General Maintenance, Inc.? When was the last time there was a piece of paper from General Maintenance, Inc.?
A. 2000.
Q. When?
A. August 2000 I believe.
Q. Do you have a particular date?
A. August 1st.
Q. August 1st?
A. 2000.
Q. 2000. So if I look at a document, if I find

PAGE 17

0017

a document from July 30th, 2000, it will be General Maintenance & Floor Service, Inc., and if I find a document -- is that correct you're shaking your head?
A. I'm just listening, I'm not.
Q. Well, is that correct?
A. Excuse me?
Q. If I find documents, or we have documents that relate to this business --
A. I want to make it very clear. Anything you need from General Maintenance, Inc. you have to ask the owners.
Q. You are --
A. Anything you need from me, Michael Bakri only, I give you paper in this specific time. From August 8 to December, I believe December 24th, something like that, this is me.
Q. Of 2000?
A. 2000.
Q. 2000 or 2001?
A. 2000. Document you need from me 2001, 28th.
Q. I'm sorry January 28th, 2000?
A. January 8, correct.
Q. January 8 or 28? Write the number down so the court reporter can see it.
A. Okay. August 8, Louisiana.

SHEET 6 PAGE 18

0018

Q. What year?
A. 2000.
Q. Okay.
A. To December 2000.
Q. End of December, December of?
A. End of December.
Q. That's the Louisiana operation?
A. Correct.
Q. August 8, 2000 to the end of December 2000?
A. Correct. Make it four months.
Q. And which business operated that?
A. Let's put it under Michael Bakri at this time.
Q. So that contract in 2000 was under your name?
A. Correct. There is no contract, just ...
Q. An agreement?
A. Mutual agreement, handshake agreement.
Q. You went to Louisiana or did they come up here to sign the handshake?
A. Just over the phone. We shake hands later on.
Q. Okay. Now the business in Minnesota, when is the first day it was Michael Bakri?
A. January 28th, 2001 to December 23rd, I'm sorry, July 23rd, 2001.

PAGE 19

0019

Q. And that's Michael Bakri?
A. Correct.
Q. Before that date was what?
A. Mrs. Hoteit before that. August 1st Mrs. Hoteit was the --
Q. Wait a minute. Let's take it one at a time. Let's talk about Louisiana. Did Mrs. Hoteit have contracts in Louisiana?
A. No, only Michael Bakri.
Q. Only Michael Bakri?
A. Correct.
Q. Now when did Michael Bakri start working in Minnesota?
A. I working for General Maintenance & Service?
Q. No, in your own name.
A. Nothing, I had none.
Q. You never had any contracts in Minnesota?
A. No.
Q. So as long as they were working in Minnesota, they were under --
A. Mrs. Hoteit.
Q. -- Mrs. Hoteit?
A. Correct.
Q. Now do you have any -- I'm not asking whether you want to give them to me or not right now.

PAGE 20

0020

A. Um-hum.
Q. Do you have in the boxes in your house any documents from the period when General Maintenance, Inc. was in charge of the company?
A. I provided --
Q. That's not my question. Do you have any documents in your house?
A. Not anymore, no.
Q. What did you do with them?
A. I'm not sure what happened to them.
Q. Well, you provided some documents to us. What happened to those documents?
A. I think they were stolen up north where the flood came, and damaged by flood.
Q. They were stolen?
A. No, damaged. Everything damaged.
Q. By what floods?
A. Up in Roseau County, last year I think.
Q. What dates?
A. I believe June 11, 2002.
Q. There were floods?
A. Yes.
Q. That was after we filed this lawsuit, wasn't it?
A. I believe, yes.

PAGE 21

0021

Q. We already asked for documents and we talked about documents before that, did we not?
A. Yes.
Q. Did you ever provide those documents to us?
A. I think I did, yes.
Q. Documents from General Maintenance, Inc.?
A. I think, I believe I provide the agency everything it requested at that time.
Q. Did you provide everything you had?
A. Yes, I did.
Q. Do you have any records from any period and from any contract or from any company showing the hours worked or who worked at different sites and what dates and what times?
A. I have only for Michael Bakri, yes, for the work that I was responsible for. Other employees I don't have any, no.
Q. Who would?
A. I don't know. Mrs. Hoteit.
Q. She took it all with her? When did she leave?
A. She leaved in, I think, 2000. I said before.
Q. I'm sorry.
A. June 2000 about. Maybe June 2000, August 2000. I'm not sure. June 2000 we can say.

SHEET 7 PAGE 22

0022

Q. Have you seen her since then?
A. Yeah, I went to Lebanon at that time.
Q. She took all that stuff back to Lebanon with her?
A. I'm not sure she -- I'm not saying she took them. She placed them somewhere.
Q. Before --
A. She moved from the house and she took all her stuff, all her belongings.
Q. Who managed the company for her?
A. She did and I did and my wife did.
Q. Your wife did the bookkeeping for her?
A. Some of the bookkeeping, yes. She did help bookkeeping, yes.
Q. What happened to the records that your wife kept?
A. Mrs. Hoteit took them. Mrs. Hoteit, when she leave the house, she took everything with her. She moved a hundred percent from the house and she took all her belongings and everything belonged to her.
Q. Where did she move? Did she move right to Lebanon?
A. I believe, yes.
Q. Or did she stop, move somewhere else here in Minnesota first?

PAGE 23

0023

A. No, she did not. She moved straight to Lebanon.
Q. Do you have any planners, notebooks, journals, anything that shows the hours of work or days of work?
A. No.
Q. Nothing, from either company?
A. Mine, yes, I said that I stated before. I have record for my, my operation hundred percent.
Q. And you will have that by the end of this week?
A. Yeah.
Q. How about tax records from any of the defendants?
A. I have mine.
Q. You don't have anything from her?
A. No.
Q. You realize you're under oath here now?
A. Yes.
Q. Let me go back now and start from the beginning. Mr. Bakri, when did you come to this country?
A. 1982.
Q. Are you an American citizen now?
A. Yes.

PAGE 24

0024

Q. When did you become a citizen?
A. 1989.
Q. What kind of work were you doing in 1982 when you came over here?
A. I was a student.
Q. A student?
A. Yes.
Q. Where?
A. Before I come to this country?
Q. Well, before you came to this country where were you a student?
A. I was journalist in Paris.
Q. You were a journalist in Paris?
A. Um-hum.
Q. And then you came to this country in '82?
A. Yes.
Q. And what did you do when you came here?
A. I went to school, some learning.
Q. Where did you go to school?
A. I went several of them. One of them in Appleton, Wisconsin, one of them in California, and one of them UMD, University of Minnesota-Duluth.
Q. And when did your mother come to this country?
A. 1988.

PAGE 25

0025

Q. Were you in business before you got into the floor maintenance business?
A. No.
Q. You never had any other businesses?
A. No.
Q. What job did you have in 1987?
A. '87? I was student at UMD.
Q. And your mother was in Lebanon then?
A. Correct.
Q. Now when did you first hear about doing floor maintenance projects, work?
A. Well, I was franchised 1989 with Gane-King.
Q. Spell that, please.
A. J-A-N-Y, or G-A-N-E, dash, King, K-I-N-G.
Q. You were franchised with them?
A. Correct.
Q. Where were you living at the time?
A. Bloomington.
Q. What brought you to Bloomington?
A. We found an apartment.
Q. You and who?
A. Me and my wife.
Q. Where was your mother then?
A. She's around here, you know, in St. Paul I think at that time, 1989.

SHEET 8 PAGE 26

0026

Q. Who was here first, you or your mother, in Minnesota?
A. Myself.
Q. When did she come?
A. '88.
Q. You already had the Gane-King contract before?
A. No, no, I didn't have it before. In '89.
Q. You had it in '89?
A. Um-hum.
Q. What was the first contract that anybody in your family had in the floor maintenance business?
A. As General Maintenance?
Q. Any name, any name, any business that anybody in your family had doing floor maintenance, doing store cleaning.
A. My mother has her own operation.
Q. When was the first time?
A. I'm not really positive, you would have to ask her.
Q. Did she have a job?
A. To be honest with you, my wife and I separate from my mother, only she lived with us last couple years but she has her own operations long time ago.
Q. Long time ago she had her own operations?

PAGE 27

0027

A. Yes.
Q. When did she begin?
A. She has construction, if I remember, in Lebanon.
Q. And then she came to this country in 1988?
A. Correct.
Q. And you were already here in Minnesota?
A. Correct.
Q. Were you doing any floor maintenance or store cleaning at that time?
A. No.
Q. Who got into store cleaning first, you or she?
A. She did.
Q. You had the Gane-King contract?
A. Correct, 1989.
Q. But she already had contracts in '88?
A. She had some work, I'm not sure, she had lot of business matters here.
Q. What name was she operating under?
A. I think her name, and Minimart one time, she had a store called Minimart. And she has technically General Maintenance, and I believe she has General Maintenance only as a name.
Q. When did she begin General Maintenance?

PAGE 28

0028

A. That year, 1989.
Q. '88 or '89?
A. '89.
Q. So there was no General Maintenance in '88?
A. No, no.
Q. So she --
A. I have Gane-King, she has General Maintenance.
Q. And who managed General Maintenance for her?
A. She did.
Q. She ran it herself?
A. Correct.
Q. And when did you begin to manage General Maintenance for her?
A. When I finish 1995 I believe. 1995. During my Gane-King I cannot work both under my franchise agreement, I cannot own or operate or manage any company besides Gane-King.
Q. What happened to your Gane-King franchise?
A. I just ceased it. I stopped it.
Q. What was the nature of the work, what were you doing with Gane-King?
A. Janitorial service.
Q. Janitorial service?
A. Um-hum.

PAGE 29

0029

Q. For what kind of places, for grocery stores or for --
A. No, not grocery stores.
Q. What kind of places?
A. I believe various offices, office cleaning.
Q. Around this area or where?
A. Yeah, Minneapolis. Not particularly here in downtown but in Minnesota. Minneapolis/St. Paul, yes.
Q. So how long was General Maintenance, Inc. doing business before you started working for it?
A. From 1997 to -- I'm not sure. 1989 she has her business. 1989.
Q. Who did the bookkeeping while she had the business?
A. She did the bookkeeping herself.
Q. Who did she have contracts with?
A. She has a lot of contracts.
Q. Who for example?
A. I cannot, I cannot.
Q. But you were away at school most of that period?
A. At school?
Q. You were at school when she had those contracts?

SHEET 9 PAGE 30

0030

A. No, I was working with my Gane-King.
Q. Okay. Gane-King. I'm sorry, I keep forgetting, Gane-King began when?
A. '89.
Q. Okay, you started working for her in --
A. 1997.
Q. -- 1997?
A. Correct.
Q. What was your job with General Maintenance, Inc.?
A. Running the crew, crew chief.
Q. And did you sign papers on behalf of General Maintenance, Inc.?
A. No, no.
Q. Did your wife do the bookkeeping for General Maintenance, Inc.?
A. Yes, she did some of the bookkeeping.
Q. When did that begin?
A. 1997.
Q. 1997?
A. Um-hum.
Q. And did you sign checks for General Maintenance, Inc.?
A. I was on the check, what do you call, my wife, we are on the check signing.

PAGE 31

0031

Q. Who hired employees for General Maintenance, Inc. after '97, after you started with them in '97?
A. Well, I did. I did, I hired employees. It was my, part of my duties to hire and train employees.
Q. And who signed agreements between General Maintenance and the various contractors for the stores?
A. There is no.
Q. There were no agreements?
A. No agreements, no.
Q. Everything was oral?
A. Yes.
Q. Now when your mother left the country, did you send notice to each of your contractors that she was no longer in business?
A. No.
Q. No?
A. No.
Q. Did you just continue the contracts she had?
A. Ceased, I believe.
Q. But did you continue working for some of them?
A. Yes.
Q. Who is ICM?

PAGE 32

0032

A. ICM is the Industrial Cleaning Management, it's a new company that came to town.
Q. Around when?
A. I think they were here 2000 I think. They are the new contractor, became the new contractor for Rainbow Food.
Q. Who handled Rainbow Food before ICM?
A. I think B.E.L.
Q. Is that B, period, E, period, L, period?
A. Yes.
Q. And who was doing the contract for B.E.L., you or your mother?
A. They have agreement, we continue agreement. You know, in 1997 nothing has been changed. As contractor changed we kept on the same.
Q. So whatever contracts there were in '97 --
A. Whatever agreement.
Q. Whatever agreements there were in 1997, after your mother left you took over the same work?
A. Yes, 2000 she left.
Q. Right. After she left you continued the same contracts?
A. Correct.
Q. Did you send any notice to the contractors that you were changing the name of the business?

PAGE 33

0033

A. No, nothing officially, no.
Q. You just continued doing the business?
A. Correct.
Q. Did you ever formally dissolve General Maintenance, Inc.?
A. I believe it dissolves itself in 2000.
Q. It dissolved itself, but did you ever file any papers with the State saying it was dissolved?
A. No, no, not me. No.
Q. Did anybody?
A. I'm not aware.
Q. So there's B.E.L., there's ICM took over after B.E.L., is that correct?
A. Correct.
Q. These are both Rainbow Foods?
A. Yes.
Q. What is Rainbow Foods?
A. Grocery stores here in the Minneapolis.
Q. Here in the Minneapolis market?
A. We're only doing 12 stores for them.
Q. You were doing 12 stores?
A. Correct.
Q. What about Louisiana, that was HiTech?
A. HiTech.
Q. And that was yours alone?

SHEET 10 PAGE 34

0034

A. Correct.
Q. And how many stores in Louisiana?
A. Four.
Q. And who hired the people for Louisiana?
A. I think I, I have supervisor there.
Q. Who was that?
A. His name is, I can't remember his name now. Jose.
Q. Jose what?
A. Martiz.
Q. Spell that, please, as close as you can.
A. M-A-R-T-I-Z.
Q. Did you have any written agreements with Mr. Martiz?
A. No, no.
Q. Who is Kevin Arango?
A. I think one of the person Jose hired.
Q. How did Jose get paid?
A. He paid by me semiweekly.
Q. How did you pay him, how much?
A. I'm not sure how much but I can find out how much. About $500 a week.
Q. How did you figure out his pay?
A. He put some hours in, he send it to me and I pay him.

PAGE 35

0035

Q. You paid by the hour to him?
A. Per hour, per night.
Q. Well, per hour or per night?
A. I believe per night.
Q. Per night?
A. Um-hum.
Q. For Mr. Martiz?
A. Yes.
Q. Jose. Other employees, did you pay them by the hour?
A. Per night, per clean.
Q. When you worked for General Maintenance, Inc., you were in charge of the pay then, too, were you not?
A. We did some payroll, yes.
Q. Did you pay by the hour or by the night?
A. No, nobody got paid per hour.
Q. It was all by the night?
A. Correct. Per clean.
Q. Define a clean.
A. Clean is a person who come to the locations, they clean it, and as soon as he finish he is done, he can leave, so there is no.
Q. So if it's three hours or nine hours?
A. Correct.

PAGE 36

0036

Q. It wouldn't ever be three hours, would it?
A. Sometimes four hours, sometimes six, depend.
Q. Sometimes ten?
A. No.
Q. Nine?
A. Could not be.
Q. Could not be what?
A. That hours, because there's a certain time between midnight and 6 o'clock employees should be out. There is no working after 6 o'clock.
Q. Who enforces that?
A. Nobody enforce it but that is the policy from Rainbow that they should be done by 6.
Q. But if they are not done, do they leave?
A. They have to leave. They cannot.
Q. Who throws them out?
A. It never happened, you know. It never happened this way, all the time the employee, they did finish.
Q. What time do they start?
A. It's up to them what time. Sometimes midnight, sometimes 10 o'clock, sometimes 11.
Q. 7 o'clock?
A. No.
Q. 8 o'clock?

PAGE 37

0037

A. They're not allowed to come that early, no.
Q. What's the earliest they can come?
A. I think, let's say 10 o'clock in the evening. They can't go there earlier than ten.
Q. You say "let's say," but what's the answer?
A. The answer is midnight, most of the employees arrive by midnight, most of them.
Q. How do they get there?
A. Some of them has their own car, some of them, if they don't have car there is a pool, carpool.
Q. Did you pay anybody to drive?
A. No, no, I provide vehicle but I didn't hire somebody to drive.
Q. What kind of a vehicle did you provide?
A. I give them a company car. I bought it and give to them.
Q. What was it?
A. It was a Ford Taurus.
Q. What year?
A. At the time it was 1998.
Q. And did that car stay until you finished the business or did you replace it?
A. No, we still have it until now.
Q. And who drove it?
A. Jose I think.

SHEET 11 PAGE 38

0038

Q. I'm talking about here in Minneapolis.
A. I'm not sure who drove, some, a lot of drivers. One of them, the one has license, he can drive. Usually employees they live at the same location, same apartment building.
Q. Who found the housing for them?
A. They do.
Q. Are they all documented workers? Were they all?
A. Yes, that is very important we document, correct. They have to be documented, yeah, unless they cheated. I'm not sure. We don't verify but they present what documents they have to work, ID and social security number.
Q. Now this Jose Martiz, did he work up here before he went down to Louisiana?
A. Yes. Yes, he did.
Q. For how long?
A. Actually he work for us since 1997. Since we took the operation here.
Q. And when did he go down to Louisiana?
A. He went with me in August.
Q. So you went down there in August to start the business?
A. Yes, correct.

PAGE 39

0039

Q. So you recruited the workers together down there?
A. No, he did.
Q. He stayed?
A. Yes.
Q. Who did you meet with in Louisiana, anybody? Or was -- did you meet with any business people in Louisiana?
A. HiTech person.
Q. Were they in Louisiana?
A. No.
Q. You didn't go to Tennessee?
A. No, no, this is different company in Tennessee.
Q. Who's in Tennessee?
A. ICM.
Q. That came later?
A. Correct. I didn't go to them, they came here.
Q. Okay. When did you cease doing business completely, stop doing business completely?
A. July 23rd, 2001.
Q. Why did you stop?
A. Dispute with ICM.
Q. Was that your last contract still with ICM?

PAGE 40

0040

A. Correct.
Q. And that was up here?
A. Yes.
Q. And everything was done already down in Louisiana?
A. Oh, long time.
Q. How did that end?
A. I voluntarily requested to be let, to be relieved from my duties. The reason I stop working is the new contract came with ICM and I told HiTech I'm not able to do both of them.
Q. Why couldn't you do both of them?
A. I don't have the capability to be working here and there and there and here.
Q. Didn't you have a supervisor down there?
A. Yes. But still not, it's not feasible for me to do them both. I cannot do them both.
Q. So you tried it and you couldn't do it?
A. Correct.
Q. How many nights a week did employees work for you?
A. Seven.
Q. The same employees I mean, one employee would work how many nights a week?
A. They should work six.

PAGE 41

0041

Q. They usually worked six?
A. Six nights.
Q. Did anybody ever work seven?
A. No.
Q. How about five?
A. Five is possible.
Q. When they started work, did you hold back a couple of weeks' pay when they started work?
A. Sometimes, yes, I believe I did. We did.
Q. Why?
A. It's the normal procedure. They have to put the time, then they get paid. It's a period, payroll period.
Q. When do they make up that pay?
A. When they quit.
Q. Do you give an extra check when they quit?
A. Correct.
Q. Your records would show that?
A. Yes.
Q. They'll show if an employee quit on August 1st of one of the years that they would get a paycheck for the previous week and for the first week?
A. Correct.
Q. They would get two paychecks?

SHEET 12 PAGE 42

0042

A. Correct.
Q. And you have records to show that?
A. Yes.
(Bakri Deposition Exhibit No. 3 marked for identification.)
A. (Examining document.)
Q. This is the complaint?
A. Yes.
Q. Okay. This is the complaint, is that correct?
A. Yeah, correct.
Q. Have you seen this before?
A. Yes.
Q. And this is the complaint in this case?
A. Correct.
Q. And did you file an answer to this complaint?
A. Correct.
(Bakri Deposition Exhibit No. 4 marked for identification.)
Q. Is Exhibit 4 the answer that you filed in this case?
A. Correct.
Q. The first sentence says that you deny all allegations listed in the complaint by the Secretary of Labor, is that right?

PAGE 43

0043

A. Correct.
Q. And this is the complaint that you're talking about, Exhibit 3?
A. Correct, um-hum.
Q. Under that sentence, is A, "This is correct." What does that refer to? What's correct?
A. On 2001, 28th, 2001, 08, that I work that, I assume that name, General Maintenance & Floor Service.
Q. Where does that say that in the complaint?
A. "Defendant General Maintenance & Floor Service, a corporation, was, at all times herein mentioned, a Minnesota corporation." Correct.
Q. But is there an A in the complaint?
A. A?
Q. Okay. There is an A, okay. And it says that it was at all times hereinafter, so it was always, it was continuously in business, is that right?
A. This should be, quote, "elsewhere, and during the period since March 1, 1999 has been engaged in the business of providing floor cleaning services." Yes, that's true.
Q. Okay. So the A in your answer refers to paragraph II.A in the complaint, is that right, Roman II, Roman numeral II?

PAGE 44

0044

A. This B?
Q. Roman numeral II.
A. Correct. This is correct, yeah.
Q. Now it says, B, "Denied."
A. "Defendant Michael Bakri, during period March 1st, 1999 was engaged in business." That's true, denied. No, I was not.
Q. You were not?
A. Correct.
Q. But B says, "Denied. There were employees. They were independent contractors."
A. "Denied. There were employees." "Defendant Michael Bakri, an individual." This is original complaint?
Q. Yes.
A. There must be something else I took the answer off.
Q. Let's go through one more, C, okay? On the answer.
A. "Defendant Michael Bakri, an individual, during the period since March 1st did business under the name of General Maintenance and otherwise." (Examining document.) That's not happened.
Q. What, C?
A. Yeah.

PAGE 45

0045

Q. But you said this is correct in the answer, right?
A. Yeah, but.
Q. So your answer doesn't track the complaint, is that right?
A. That's right. Correct. Not 1998. '99. 2001, yes. The name entitled General Maintenance and otherwise Brooklyn Park, Minnesota. I did not do any business under my name.
Q. Okay. And you're referring to paragraph II.C, right? Roman numeral II.C?
A. Correct.
Q. On the complaint?
A. I don't think so. I'm not sure if I answered this from this, I don't think so. I believe I -- I'm not sure I answered, I don't think I answered from this copy.
Q. So you didn't answer the complaint then, did you?
A. Not this one.
Q. That was the only complaint in this case.
A. I believe there is something else.
Q. All right. Let me show you what I have.
A. Because it's A, B, C, D, E, F, G. That does not reflect these numbers here.

SHEET 13 PAGE 46

0046

Q. In fact, the numbering on the answer, if you look at the answer, is a little bit out of order, isn't it? It says A, B, C, D, C, D, E. So C and D are repeated, aren't they, in your answer? Not on the complaint but in the answer, is that correct? There's a mistake in the numbering on the answer. Here, on the answer, Exhibit 4, the lettering is A, B, C, D, C, D, E. So it's C, D, C, D, right?
A. Oh, okay.
Q. So it's not correct. And that numbering does not follow the numbering in the complaint, does it?
A. No.
Q. So you didn't answer the complaint, did you?
A. I believe I answer what I have in my hand at that time from the court is a complaint. This is listed A, B, C, D, E, and F and G.
Q. But you didn't answer this, this document No. 3, the complaint, you didn't answer that, did you?
A. I'm not sure what I answered. Seemed to me it's not.
Q. I would like you to take a look --
A. Because A, B, C, D, what question D?
Q. I'm asking you. You answered D on your answer. I don't see any D in the complaint.

PAGE 47

0047

A. It must be different than this one here.
Q. Did I ask you about this when we met here in this office last year?
A. Yes.
Q. All right. Let me show you now No. 5.
(Bakri Deposition Exhibit No. 5 marked for identification.)
A. I have to look.
Q. Take your time. Take a look at 3 and 4 and 2.
A. What is this?
Q. This is called a declaration, No. 5 is a Declaration of Investigator in Support of Plaintiff's Motion for Judgment by Default.
A. (Examining document.) Seemed to me this is what I answered I think.
Q. Is that a complaint?
A. Let me see. No. A. (Examining document.) Seems to me this is what has been answered.
Q. So Exhibit 5 is what you answered instead of the complaint, is that correct?
A. I believe, yes.
Q. Let's look at Exhibit 5, paragraph 3, it starts on the top of page 2.
A. This one?

PAGE 48

0048

Q. Yep.
A. Um-hum.
Q. And let's look at the lettering, or the numbering, alphabetical numbering under paragraph 3, and let's just go over the numbers and compare them to the answers that you filed. A, B, C, D.
A. Okay, C.
Q. C again, D again?
A. E and F and G. I think this may have been what has been answered, yes.
Q. So you answered this instead of the complaint, correct?
A. Maybe by mistake, yes.
Q. So you never did answer the complaint, is that right?
A. I believe I was doing the complaint.
Q. You thought you were?
A. Yeah.
Q. But this is what you were actually answering?
A. Yeah, correct. Correct.
Q. So when I filed a paper with the court saying that you answered this instead of the complaint I was right, is that correct?
A. Did you say that?
Q. I wrote a letter to the court saying that

PAGE 49

0049

you, I told the court that you were answering Exhibit 5 and not the complaint. Was I right at that time?
A. I'm not.
Q. If I told the court that you were answering this declaration, Exhibit 5, instead of the complaint, would that have been true?
A. Yes.
Q. And you never answered the questions in the complaint, Exhibit 3?
A. Maybe by mistake, yes. Paying not attention, no.
Q. But you didn't answer it?
A. No. If you ask me word by word, no. But in general, this is a complaint, very close to what it is.
Q. Okay. But you didn't answer the complaint?
A. No, no. But this is what it is, the complaint. So many paperwork.
Q. Well, the complaint was served in December of 2000, was it not, or maybe January 2001?
A. The complaint should not be sent to me. I wasn't supposed to answer that complaint.
Q. Who was --
A. It was not addressed to me.

SHEET 14 PAGE 50

0050

Q. Who --
A. Mrs. Hoteit.
Q. Is your name on there as a defendant?
A. Yeah, somebody put my name there.
Q. But you owned one of the companies. The question is not who should have, the question is did you get that on probably, I think, December 31st of 2001?
A. Yes, I did.
Q. You did have that?
A. Um-hum.
Q. And it was served on you by U.S. Marshal?
A. No, I don't know.
Q. There was a motion for default. Was that served on you? You showed up in court?
A. I tell you something. Somebody brought some paper and give it to an eight-year-old daughter, and this is the way it happened, you know.
Q. You were the manager of General Maintenance, Inc., is that correct?
A. Date?
Q. The corporation.
A. Date?
Q. 1998.
A. 1998?

PAGE 51

0051

Q. Um-hum.
A. No.
Q. When?
A. 199 -- yeah, I was part of managing, yeah, considered manager, yeah.
Q. And you signed papers as a representative of General Maintenance, Inc. in 1998, '99, 2000?
A. Yeah, but there's no paper signed. I'm allowed to sign some papers, yes.
Q. What is that second sentence?
A. There is no paper to signed. There is nothing to sign. We never signed anything.
Q. You signed checks on behalf of General Maintenance, Inc. during that period?
A. Yes, I said my name is on the signature list.
Q. So this document was served on you, is that correct? You got a copy of this?
A. Yes.
Q. And you were named in this complaint as a defendant, right?
A. Correct.
Q. And the corporation is named in this complained, is that correct?
A. Correct.
Q. Did you send a copy of this complaint to

PAGE 52

0052

anybody else?
A. No.
Q. Did you show it to a lawyer?
A. No.
Q. Did you show it to your mother?
A. No.
Q. Did you tell your mother about it?
A. She doesn't care.
Q. She doesn't care, it's her business but she doesn't care?
A. Yeah, she don't. She is very sick. She's not.
Q. Was she active in the day-to-day operation of the business?
A. Before, yeah, 1989 to 2000 she was.
Q. When did she stop being really active every day?
A. When she, she left 2000.
Q. In 2000.
A. June.
Q. In June of 2000. When did she get sick?
A. She's always, she was long time sick but severely she got sick at the end 1999 and 2000.
Q. So were you taking more and more over the business during that time?

PAGE 53

0053

A. The business dissolved within I think couple, three months.
Q. I'm not talking about what we call the business, I'm talking about running the business of hiring the people to do floors.
A. Yes, I always been since 1997 involved in the management.
Q. Right. So basically you were doing the day-to-day management from 1997 on, were you not?
A. No, she did.
Q. What did she do?
A. She take care of her money, her bills, her profit.
Q. But did she hire the employees?
A. No.
Q. Did she tell them what to do?
A. No.
Q. Did she assign them the stores to go to?
A. No.
Q. From 1997 on you were doing all that?
A. Yes, um-hum.
Q. Did anybody else do that?
A. My wife.
Q. Your wife?
A. LeAnne Bakri.

SHEET 15 PAGE 54

0054

Q. She took care of the books?
A. Yes.
Q. Did she do anything else other than the books?
A. No.
Q. So everything other than the bookkeeping you did from 1997 on, is that right?
A. 1997? No. I described my duty is just to hire and to train the employee.
Q. What other jobs were there to do?
A. Nothing.
Q. That's the only things there were to do?
A. Nothing.
Q. So you did everything then, right?
A. Besides paying the employees there's really nothing to do.
Q. So you hired them and paid the employees and told them where to work?
A. Correct.
Q. And you worked out the deals with the contractors, too?
A. Well, there's nothing really.
Q. There were arrangements between --
A. Yeah, I mean I took phone calls and answered the stuff.

PAGE 55

0055

Q. Did your mother take those phone calls?
A. No, no.
Q. Starting when? Did she ever take those phone calls?
A. I don't believe, no.
Q. So all the time you were -- did you change anything you did after your mother left in the way you ran the business?
A. Just closed down, the business closed.
Q. But you never, you ran it the same way before and the same way after, right?
A. Technically, yes, the same.
Q. Technically. But actually?
A. Yes, this is routine, there is nothing really.
Q. There was nothing to do, you hired the employees before and after, right?
A. Yeah.
Q. And you paid the employees before and after?
A. Yeah.
Q. You and your wife?
A. Yeah.
Q. And you told the employees where to go before and after the corporation ended, right?
A. Yeah.

PAGE 56

0056

Q. So nothing changed really, did it?
A. No.
Q. So General Maintenance was in business from before 1999 and continued until it was dissolved, is that right? General Maintenance, Inc.
A. Yeah.
Q. And since March of 1999 and before and after you hired the employees, fired the employees, set their schedules and told them where to work, right?
A. Okay. We have, I think, let's go back to hiring. Hiring was done by Jose Martiz.
Q. Here in Minneapolis as well?
A. Correct.
Q. Even after he went down to --
A. No, I'm talking about the period before 2000. August 2000, June 2000.
Q. And who told them where to work?
A. Technically his, his.
Q. Technically, but what about actually?
A. His.
Q. You never did that?
A. Some, but not in general because I don't speak Spanish and most of the employees speak Spanish, and Jose was really the person, he hired.
Q. Did you tell Jose who was supposed to work

PAGE 57

0057

and where?
A. No.
Q. How did he know?
A. It's his duty to do that.
Q. Where does he get the information from, the air?
A. He knows which store needs.
Q. Who told him which stores need work?
A. Sometimes myself, sometimes my wife.
Q. Your mother tell him?
A. No.
Q. So Jose worked for you under your instructions?
A. Correct. I am responsible for the operation, yes.
Q. During the whole period?
A. Yes.
Q. Your employees handled floor stripper and chemicals like that and cleaning equipment?
A. Yes.
Q. Where did that cleaning equipment come from?
A. HiTech.
Q. And HiTech is located where?
A. The equipment and the chemical are provided from the contractor to Rainbow Food. They are at

SHEET 16 PAGE 58

0058

Rainbow Food.
Q. Where does it come from? Do you know?
A. I think from HiTech warehouse.
Q. And HiTech's warehouse is where?
A. I believe in Chicago.
Q. In Chicago?
A. I believe.
Q. Not in Tennessee?
A. No, no, there is one -- this is the factory. There is one here in town. They used to rent space at Rainbow Food.
Q. But the stuff gets shipped up from somewhere else?
A. The chemical made in Chicago, yeah. But HiTech has a warehouse at Rainbow Food.
Q. Did you ever have any customers in the Minneapolis area other than Rainbow?
A. No.
Q. Only Rainbow?
A. Yes.
Q. So whether it was HiTech or somebody else -- no, wait. Your contract up here was with HiTech, too?
A. Yes, before. Yes. I worked with HiTech.
Q. So let me just get the time lines. We have

PAGE 59

0059

B.E.L., ICM and HiTech?
A. Correct.
Q. In Minnesota what's the order of them?
A. That would be HiTech, B.E.L., B-E-L, and ICM.
Q. Now HiTech ended in what year?
A. '99 maybe.
Q. And then ICM took over?
A. No, I worked with B.E.L.
Q. For a while?
A. For a while.
Q. What happened to B.E.L.?
A. They just, contract took over by ICM.
Q. And ICM was in it until the end?
A. Correct.
Q. Do you know who is doing the work now?
A. I think ICM.
Q. Do you know who is doing work for them?
A. Yes, I think Carlson Floor Care.
Q. Do you have anything to do with Carlson?
A. No.
Q. How much did you pay the employees per clean?
A. $60 per night minimum.
Q. When would they get more?
A. When they are, there is not really, when they are working on a crew maybe stripping.

PAGE 60

0060

Q. That happen very often?
A. Some people come from cleaning to a crew, with a stripping crew, maybe they get up to $80.
Q. How many were on the stripping crews?
A. Eight I think.
Q. How often?
A. Wintertime most of the time. Only winter.
Q. Once in a while or every week?
A. No, no, just every six, minimum six months.
Q. They would do one stripping job?
A. Correct.
Q. So they would go through all the stores once and strip?
A. Correct.
Q. Do the same people work stripping all the time?
A. We did not do the stripping until, only I did that from January 28th to July 23rd.
Q. Of what year?
A. 2001.
Q. So you didn't do stripping before then?
A. Little bit, not.
Q. You didn't pay that extra money, though, before that?
A. No.

PAGE 61

0061

Q. How long did stripping take?
A. About six hours.
Q. Wasn't that more time-consuming than cleaning the floors?
A. No, no, because the store is divided. The store would be divided and take about four nights but each section.
Q. So different crew does each section?
A. No, same crew they go four nights.
Q. Are these chemicals dangerous at all or hard to use?
A. No.
Q. They hurt your hands?
A. No.
Q. But you never did pay overtime to any of these employees?
A. No, there is no overtime.
Q. No matter how many hours they worked in a week?
A. Correct.
Q. Did you keep records of their actual hours?
A. No.
Q. Did you have records of the days they worked?
A. What are you asking me now? What year?
Q. Well, let's start from '99.