**DEPARTMENT OF LABOR V. GENERAL MAINTENANCE & FLOOR SERVICE, ET AL.**
**DEPONENT: MICHAEL BAKRI**
**DATE: APRIL 28, 2003**

SHEET 17 PAGE 62

0062

A. No, no records. There used to be records but we weren't able to find them.
Q. Do you have them for 2001?
A. Correct, I do.
Q. And have you provided those to us?
A. I don't believe. But I do have them for 2001.
Q. Hmm?
A. I have them 2001, yes.
Q. What about 2000?
A. No. Louisiana I guess.
Q. Louisiana?
A. Louisiana I guess, I believe I provided to you. I don't believe I have, no, I don't have Louisiana. They took them, the employee took the record.
Q. The employee took the records?
A. Um-hum.
Q. What employee?
A. I have these people working for me in the apartment where my office is, and they stole everything.
Q. They stole everything?
A. Everything.
Q. Who was that?

PAGE 63

0063

A. I believe one person, his name is Bruce.
Q. Bruce what?
A. I'm not able to find his name.
Q. And he stole everything?
A. Yeah.
Q. He stole the records?
A. Records, furniture, tools, vehicles, everything.
Q. Did you file a police complaint?
A. Correct.
Q. Where?
A. Louisiana.
Q. And when was this?
A. It was in February 2001. Jefferson Parish.
Q. He stole all your records?
A. I think Jose hired him as a supervisor at the time, and he was in control of the operation in Louisiana between November and December. He was living in the apartment.
Q. Did the workers provide any equipment?
A. No.
Q. You provided everything they needed or the store did, one or the other?
A. The store did.
Q. Store provided everything they needed?

PAGE 64

0064

A. Um-hum.
Q. So they just showed up?
A. Correct.
Q. Did they have to pay anything to you to work there?
A. No.
Q. Did they have to pay anything to the store to work there?
A. No.
Q. Did they have to make any investment to work there?
A. No.
Q. They just, once they were hired somehow they would get to the store?
A. They will be trained and start working.
Q. Who did the training?
A. The supervisor.
Q. Okay, and they started working. Once they started working do they need much more supervision?
A. Generally, no. You don't need supervision.
Q. So each one would do a different store every night?
A. Yeah, one store, two people. Depending. Louisiana I have two person. Two persons they work at night per store.

PAGE 65

0065

Q. Two people per store?
A. Um-hum.
Q. So they're not alone in the store then?
A. No.
Q. How many stores were there?
A. Four. Four to five maybe.
Q. Four to five stores?
A. Um-hum.
Q. All the Rainbow stores combined were only four stores?
A. No, not here. I'm talking about Louisiana.
Q. Okay, Louisiana. What about here?
A. There's about 12 stores here, and one person per store.
Q. Are they smaller stores here than in Louisiana?
A. No. Well, actually Rainbow have bigger little bit.
Q. How come only one person here?
A. Just what they paid, you know.
Q. Based on what Rainbow would pay you?
A. Correct.
Q. Or ICM?
A. Correct, correct. I didn't have to hire two person down south but for reasons we did, and they

**DEPARTMENT OF LABOR V. GENERAL MAINTENANCE & FLOOR SERVICE, ET AL.**
**DEPONENT: MICHAEL BAKRI**
**DATE: APRIL 28, 2003**



0114

A. Yes.
Q. Did they make deductions?
A. No, there's no deductions.
Q. So these numbers?
A. Were correct. Whenever we bill them, they pay.
Q. So these numbers are all correct?
A. Correct.
Q. And they paid you those amounts?
A. Correct.
Q. And this is back in '98 and '99, mostly '99?
A. 1998.
Q. And then as you go further back they are '99?
A. Correct.
Q. When did you stop with B.E.L.?
A. They changed. ICM took over.
Q. But when was that, do you know?
A. January 28th.
Q. That's when that letter came?
A. This one (indicating)?
Q. No, the other letter before.
A. Correct.
Q. January 28th, 2000?
A. 2001.
Q. So that's the date that you changed and they



0115

changed both?
A. Yes, they -- B.E.L. stopped to exist, ICM took over. General Maintenance Floor Service stopped, Michael Bakri took over.
(Bakri Deposition Exhibit No. 17 marked for identification.)
Q. Exhibit 17 is Department C-20?
A. This is a duty from HiTech.
Q. A duty?
A. List of duties I have to do in Louisiana stores.
Q. Now it starts up with part 5 on the top of the page. Were there earlier parts of this document?
A. Yeah, there is, I think, one page or two page. I don't have.
Q. You don't have those?
A. No. Just listing the duties, what I have to do in the Louisiana stores. That's it, you know.
(Break taken from 3:16 to 3:24 p.m.)
Q. We're going to try and go through these documents. I don't know if we'll get through these or not. If we have to come back in the morning we will. Mainly I'll just ask you to look at them and tell me what they are.
(Bakri Deposition Exhibit No. 18



0116

marked for identification.)
Q. Looking at Exhibit 18, Department C-21, have you seen this before?
A. No.
Q. You don't know what this is? I mean there's an explanation at the bottom that the department put there, but looking at it, is it familiar at all?
A. Okay. This is what HiTech is going to pay for strip and wax a store.
Q. So it says $1.19 per square foot per year?
A. Yes.
Q. And that's for stripping and waxing or just cleaning?
A. No, stripping and waxing.
Q. So how often did you do stripping and waxing?
A. About twice a year, not more. Average twice a year.
Q. But this is a yearly price, right?
A. Yes.
Q. And is this a square footage figure in the last column?
A. Yes.
Q. Let's go back to Exhibit 17. The handwriting at the bottom, did you ever see that handwriting?
A. Yes.



0117

Q. Whose is that?
A. This is Sam Danbury, the manager of HiTech.
Q. There I believe it says at the bottom HiTech agrees to pay contractor?
A. 26 percent.
Q. Well, .026 cents?
A. 26 cents.
Q. No, 2.6 cents?
A. No, 26 cents.
Q. Well, .026.
A. That means 26 cents.
Q. Per square foot?
A. Um-hum.
Q. Per week, right?
A. Correct.
Q. Well, that would be a lot more than a dollar-nineteen per square foot a year.
A. This is stripping/waxing. This has nothing to do, this is one-time job. This is nightly job. They don't go together.
Q. Okay.
A. We're talking two different things here.
Q. Good, that explains that. It just happens the math works out if it's .026. Now these are all the stores in, are these the Louisiana stores on page

SHEET 29 PAGE 110

0110

out how you got from your invoice figure to the actual figure?
A. Correct.
(Bakri Deposition Exhibit No. 15 marked for identification.)
Q. This is from ICM also?
A. Yes.
Q. Exhibit 15. Now you see the cover letter here? What is that doing? What's the purpose of that?
A. The cover sheet?
Q. Um-hum.
A. Changing the name I believe.
Q. And they sent you a letter to tell you that?
A. Yes.
Q. And then they sent you a new contract, is that right, a revised contract, is that right?
A. Yes.
Q. Okay. The revised contract is C-18 various letters, a through e. Where is the revised contract?
A. I did not sign it.
Q. You never signed that one either?
A. No.
Q. Is this the same one we're talking about before?

PAGE 111

0111

A. It's a different one but I did not sign it.
Q. You never signed it?
A. No.
Q. But you still continued to work for them?
A. For a while, one month.
Q. Did you drop them or did they drop you?
A. They did. I did not drop them. It was too much for me to drop them, but they dropped me.
Q. And that was when you were out of business then?
A. Correct.
Q. Why did they drop you?
A. Say I'm not doing a good job. Nonperformance.
Q. Did you ever send out a letter like this to the people you did business with?
A. No.
Q. But you saw how they did that here, they send a letter to tell people that the company's name had changed?
A. Yes.
Q. But you never did that?
A. No.
Q. Is this similar to what we looked at before? The second page, C-18b, is that the same one we

PAGE 112

0112

looked at before?
A. Technically the same.
Q. This looks like your handwriting, your wife's printing?
A. They should not be in here. There is nothing, my exhibit. Oh, they did. They insert this one in.
Q. But that's from the old one?
A. They took the old one and put it in the new one.
Q. Oh, okay, so it's the same document we were looking at before?
A. Correct.
Q. C-18b is the same document as Exhibit 13?
A. No, Exhibit 12. Exhibit 12, page C-5c.
Q. That's the same document, they just put it with their contract, is that right?
A. Yeah, they insert it in there.
Q. And you didn't accept these changes either?
A. No.
Q. So you never returned this contract?
A. No.
(Bakri Deposition Exhibit No. 16 marked for identification.)
MR. GROSSMAN: Exhibit 16 for the

PAGE 113

0113

record is Department C-19, et cetera. C-19b through 19f.
A. Yes, I received that.
Q. Now that's addressed to whom?
A. To me.
Q. As owner General Maintenance & Floor Service, Inc.?
A. He address it this way, yeah.
Q. And this basically says they intend to continue doing work with you?
A. Correct.
Q. As long as everything is okay?
A. Um-hum. I'm not the owner.
Q. Page C-19C, the second page of Exhibit 16?
A. Um-hum.
Q. Is a funds transfer request. What is that about?
A. They used to put money in the account.
Q. That's how they paid you?
A. Yes. Direct deposit.
Q. And this is B.E.L.?
A. B.E.L., yes.
Q. C-19d?
A. Yes.
Q. Is that, that's your regular invoice?

SHEET 28 PAGE 106

0106

A. $30 for I think shipping maybe. Envelope, they send me the check, they charge me for it.
Q. Did they send them by overnight courier --
A. Correct.
Q. -- or UPS or something?
A. Something like that. $33 official only on, repair on, I'm not sure what is that, but repair on, this page C-7c, see the top one? This is repair on tray. I don't know. $33, I'm not sure what that is.
Q. They deducted that from you?
A. Correct. Not, you know, anything is not -- only contract paid, this is what they paid me.
Q. So the reason the void checks, I guess they continued the invoices to more than one check so they could get all the invoices onto one total so the checks and the invoices are on one stub?
A. Correct.
Q. I understand what that sentence means. That tracks the invoice, and that's the end of the package. Will you look through the rest of these sets, just tell me if there's anything different or if they're all the same?
A. All the same. I have to look at the original again. All the same.
Q. You invoiced them, they paid you minus

PAGE 107

0107

whatever deductions they did?
A. Hundred dollars a night, a week.
Q. Hundred dollars a week for each store plus some incidental expenses?
A. Yes.
Q. So we can treat these as accurate expenses?
A. Yes, accurate payment. If you take, example, you were discussing this paper before, Exhibit 11. C-4a.
Q. Um-hum?
A. Or we can go to No. C-4b, second page.
Q. Okay.
A. You have customer Rainbow Foods?
Q. Um-hum.
A. 1201 Larpenteur, Store No. 26.
Q. Am I looking at the right one?
A. C-4b.
Q. Okay, yeah.
A. Okay. You have here 620, yes, on top?
Q. Um-hum.
A. We bill on here, 26.
Q. I'm sorry, now we're looking at the other exhibit?
A. Correct.
Q. What's the C number on that one, C-7a?

PAGE 108

0108

A. C-7a from Exhibit 14.
Q. C-7d, right. Yeah?
A. Okay, C-7d.
Q. Show me again.
A. You have here 620.
Q. On which line?
A. At the top.
Q. Yeah.
A. We bill them for 666.
Q. Okay.
A. Minus, they took hundred dollars.
Q. So it's 566?
A. Yeah. This is what we paid per store. This is what the, we bill them what is on here. You can check another one example. Let's go see 12493 Central Avenue. That's store No. 32.
Q. You're looking at?
A. The same C-7d.
Q. Okay, C-7d, but what's the other document?
A. Same page.
MS. TOUT-NAVA: C-4d.
A. You can take No. C-4d.
Q. Yes.
A. I think the store is Rainbow Food No. 32.
Q. Okay.

PAGE 109

0109

A. You see the bill, we bill them 665.
Q. Right.
A. Minus hundred dollars because during the check we bill them this, they send the check here showing that they paid the bill minus a hundred dollars, actually a hundred per week, yeah. This is the way you're going to figure out.
Q. Okay. So if you want to flip again through the rest of this, Exhibit 14?
A. They're going to be correct. I assume they will be correct, otherwise I'll let you know.
Q. You're not going to have them to take with.
A. You're going to take this from me?
Q. Yes.
A. I thought this was going to be my copy.
Q. We'll talk later about getting you a set.
A. Yeah, I have to, for the court to examine. I don't need all this copy but some of them I need. Because I have them.
MR. GROSSMAN: Go off the record.
(Discussion held off the record.)
Q. The net totals on the checks are correct, you did receive those amounts?
A. Yes, I did.
Q. And what you just explained is how to figure

SHEET 27 PAGE 102

0102

Q. Okay. Will you take a look at this? So the first check here shows a payment of $19,388.93, is that right?
A. How much?
Q. 19,388.93.
A. Yes, um-hum. But they're not in order, I don't believe these are in order. These are just -- I don't believe they are in order.
Q. Let's see.
A. This is July? You say this is 6/28. So they're not in order.
Q. If you look carefully, I think you will see they are in reverse order?
A. Correct. Maybe.
Q. The latest one is on top? Starting at the bottom on C-17 we see February 23rd, 2001, the very last one?
A. This one here?
Q. No, the very bottom one.
A. Okay.
Q. That's February 23rd, right?
A. Um-hum.
Q. And that goes back, if you look at the invoice date in the top left corner to January 22nd, I'm sorry, February 23rd, 2001, right? And it goes

PAGE 103

0103

back to, well, it's the week of February 23rd, is that right?
A. Um-hum.
Q. And these are for one store or all stores or what? Is it per store? How are these organized?
A. I'm not sure. What page are you looking at?
Q. I'm looking at the top of the last set. Maybe it will make it more clear if we start from the top of this package instead of at the bottom.
A. It's not ...
Q. Let's start at the top.
A. I think I should provide you my own copy.
Q. Turn them upside down again, turn them all over again and we'll start with the one that's on top.
A. Okay.
Q. That's the latest set. Okay. These are checks from ICM, is that correct?
A. Yes.
Q. And supporting documents, related documents, right?
A. Correct.
Q. The first one for June 28th, 2001 is in the amount of $19,388.93 at the top?
A. Here?

PAGE 104

0104

Q. Yes.
A. Okay.
Q. And that covers invoices, eight invoices, right?
A. Eight stores.
Q. Now the next page is a void check. I don't know why that was.
A. Um-hum I'm not sure what it is.
Q. These next two checks are voided.
A. Um-hum.
Q. Now there's an invoice at the back of this package, C-7d of 14?
A. Um-hum.
Q. What is that?
A. d?
Q. Yes.
A. It's a bill.
Q. It's a bill that you sent?
A. Correct.
Q. And it shows you how much you were billing for each store for that week?
A. Correct.
Q. So the total for that week was 14,268?
A. Correct.
Q. So that doesn't go with this --

PAGE 105

0105

A. No.
Q. -- paycheck. So the check --
A. There's a 7,500, too.
Q. Pardon?
A. There's page No. 2, page No. 1.
Q. Another 7,000?
A. Yes.
Q. Page 2 is 7,585. So that would be over 21,000, but the check is for 19,000.
A. Um-hum.
Q. So it doesn't coordinate either?
A. 14,268 plus 7,585. 21,353 minus -- they took a lot money, you know, they took off money.
Q. Why did they take off money?
A. All these hundred dollars are minus. This is minus here; one, two, three, four, five, six, seven, eight, nine, ten, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24. 2,400 plus a few. 2,400. Yeah. This is right.
Q. So the total is correct, 19 --
A. Yeah.
Q. Because they're taking off a hundred dollars for what?
A. $900 plus a few things all right, like $30.
Q. $30 for what? Just so I understand.

SHEET 26 PAGE 98

0098

Maintenance & Floor Service Inc.," is that right?
A. Yeah, she put that. It shouldn't be.
Q. Shouldn't be but that's the name that's there, right?
A. Yes.
Q. And you signed it there, right?
A. No.
Q. That's not your signature there?
A. No.
Q. So your wife signed for you?
A. She did I think, yes. You can tell, see how my "i" is?
Q. You're looking at the bottom of Exhibit 12?
A. Correct.
Q. Just a straight-up line with a little dot?
A. Yeah. That's not my signature. I can tell. But it doesn't matter. We assumed that name and if we have to, when the company is over, we assumed it on the 28th. Nothing has been filed with the state.
Q. The subcontractor data sheet here, that was December 5th, 2000?
A. No, should be 28th.
Q. Of 2000?
A. 2001.
Q. I'm sorry, look at the subcontractor data

PAGE 99

0099

sheet marked C-6b, it's part of Exhibit 13. There's a date here (indicating).
A. No, it couldn't be. Shouldn't be. I did not start working for them until, this is signed on 28th.
Q. Of what?
A. January 28th. Actually January 28th. This is January 30th, 2001.
Q. What's that, the fax date?
A. I sent it to them.
Q. I see, so there's a fax date on the top of the document?
A. Correct.
Q. And that's when you sent it to ICM?
A. Yes.
Q. So that's your fax on the top and it shows that you sent it on January 30th, 2001?
A. Correct.
Q. Even though it was dated December 5th, 2000. So you had it ahead of time?
A. Yeah, they send it a long time ago.
Q. So when you signed it you were still --
A. I signed it on January 28th at 2 o'clock, 2001.
Q. Okay. Now page C-6d, which is part of, last page of the exhibit?

PAGE 100

0100

A. Same thing, information.
Q. You're seeking a tax number, right?
A. Yes, but that tax number does not correspond to the name because this is my social security number, not the company federal ID number.
Q. Now that's signed by you, middle of the page?
A. No, my wife.
Q. And what's the date there?
A. 12/5.
Q. Is that right?
A. Um-hum. Well, we have that from, at home, 12/5, yeah.
Q. But this was also faxed on January 30th, correct?
A. Correct.
Q. But you signed it ahead of time?
A. She signed it. We have the document at home. We were negotiating with them.
Q. Negotiating with who?
A. ICM.
Q. But this document went to the IRS, did it not?
A. It went to ICM. No, it did not go to IRS. This is just.
Q. Isn't this a document that's normally filed

PAGE 101

0101

with the IRS?
A. No.
Q. No. It's a Request for Taxpayer Identification Number and Certification. Who does that W-9?
A. These, ICM requested this form to be filled.
Q. I see, goes to requester, not to the IRS?
A. Um-hum, but this is my social security number. That's correct.
Q. Let's mark these --
A. I have these.
Q. This is going to be Group Exhibit 14, and it is Department of Labor, it's collectively Department of Labor's C-7a, or C-7, it's several pages, C-8, C-9, C-10, C-11, C-12, C-13, C-14, C-15, C-16, C-17. So we're looking at Exhibit 14, C-7 through C-17.
(Bakri Deposition Exhibit No. 14 marked for identification.)
A. This is paychecks.
Q. These are paychecks?
A. Correct.
Q. To whom from whom?
A. From ICM to Michael Bakri.
Q. And how often did you receive one of these?
A. Every two weeks.

SHEET 25 PAGE 94

0094

Q. So on each one of these you got paid a hundred off whatever it says?
A. Correct.
Q. So 382 for the --
A. Correct.
Q. 618 --
A. Correct.
Q. Or 518 where it says 618?
A. Um-hum.
Q. This is for a week. How many nights in a week?
A. Seven.
Q. So you covered the stores seven nights a week?
A. Um-hum.
Q. Even though your workers worked six nights, you had overlap?
A. Yes, yes.
(Bakri Deposition Exhibit No. 12 marked for identification.)
A. That's the contract I have. This is what I signed with ICM, this is the contract between me and ICM.
Q. And this is Exhibit 12 which is Department's C-5a and b?

PAGE 95

0095

A. Um-hum.
Q. This doesn't have the amounts though, right?
A. No, there's nothing here, just the general contract.
Q. Now what's the date of this one? Do you have a date? Do you know when this was signed?
A. 28, January 28.
Q. Of 2001?
A. 2001, correct.
Q. And you signed it as owner there, right?
A. Owner I signed here.
Q. And this was General Maintenance & Floor Service, right?
A. Well, technically shouldn't be this way.
Q. This is what you signed, Michael Bakri, General Maintenance & Floor Service?
A. I tell you this is going to be controversial little bit.
Q. What does it say under "Subcontractor, Business Name"?
A. Where is that?
Q. (Indicating) top right under "Subcontractor." What's the name of the company?
A. General Maintenance, that was my wife. This is wrong, she signed it wrong. General Maintenance &

PAGE 96

0096

Floor Service, shouldn't be.
Q. But you signed it, right?
A. Yes, I signed it.
Q. Twice, right?
A. Only one time.
Q. You signed it in the middle of the page, Michael Bakri?
A. Right above "Michael Bakri Owner." This is my wife's writing.
Q. Down here at the bottom where it says "Signature of Guarantor"?
A. I signed this but I did not sign this one here. This is not my writing.
Q. That's the one in the middle of the page?
A. Correct, it's not my writing.
Q. Okay.
A. Should be General Maintenance only, not Floor Service, I did not own that company. But if there is some problem we maybe assumed the name in 2000 but it didn't work anyway. Should be Michael Bakri.
(Bakri Deposition Exhibit No. 13 marked for identification.)
Q. Take a look at Exhibit 13, which is Department C-6a through d.
A. Um-hum.

PAGE 97

0097

Q. The cover page is a memo from who to whom?
A. It's the same. It's the same record. This is part of this.
Q. Goes with 12?
A. Correct.
Q. But this is your wife's handwriting?
A. Yeah.
Q. She signed your name there on the cover page?
A. Yes.
Q. Okay. And she called it there doing business as General Maintenance & Floor Service, correct?
A. Correct. Shouldn't be.
Q. This is about some kind of insurance?
A. No.
Q. No, nothing about insurance?
A. No, this should be with it. This page should go inside one of these records, this part of the ...
Q. So page C-6b?
A. Part of the (indicating).
Q. Exhibit 12?
A. Correct.
Q. So C-6b should really be part of Exhibit 12. Tell us what C-6b is?
A. It's information about the company.
Q. Now it says "Company Name: General

SHEET 24 PAGE 90

0090

Q. Different store, right?
A. Right, different location.
Q. Is this the same date?
A. This is just a contract, I have to sign for them. They ask me to sign this contract. This is store No. 12. You see Rainbow No. 12 for example. Rainbow Food No. 26. Rainbow Food No. 29.
Q. Let's look at the left, bottom left starting on the first page of the C-4A and there's handwritten numbers in there. What are all those?
A. I have the originals of this at home. There is nothing like that.
Q. What does that mean?
A. I don't understand.
Q. You don't know what this is about at all?
A. No.
Q. You don't know what these calculations are?
A. No.
Q. And they weren't on the documents you have?
A. No.
Q. Will you provide those documents on Friday?
A. Yeah.
Q. Or a week from today?
A. Yeah.
Q. Same thing on the next page, C-4b?

PAGE 91

0091

A. Yes.
Q. This one was for $620 a week?
A. Um-hum.
Q. Right?
A. Correct.
Q. Show me that hundred-dollar deduction on the first one? Where was that on C-4a?
A. Hundred dollars down written by -- here, the total amount to be paid subcontractor weekly for service is at least once per week 989 including wash, wax in price. Price including hundred-dollar equipment bonus to be paid for as long as subcontractor purchasing equipment from ICM.
Q. Right. So they were paying you that extra hundred, they included in there, that hundred was included in there, it was going to be paid as long as you get your equipment from them?
A. I could not understand that statement.
Q. You didn't understand. So did they give you a check for 989 or 889?
A. 815.
Q. 815?
A. Yeah, they took hundred from 915.
Q. That doesn't have anything to do with this hundred down below here, does it?

PAGE 92

0092

A. I will bring what they paid. I do have this document.
Q. Now the next one, C-4b for the St. Paul store on Larpenteur shows $620?
A. Correct. Smaller store.
Q. And then for the 8950 Highway 7 store, $482?
A. Yeah.
Q. But it talks at the bottom about the amount to be paid is 518, not 482. Why is that?
A. That one is disputed. I did not sign them so I don't know what this, 518 minus a hundred dollars.
Q. It doesn't say minus a hundred dollars. It says it's going to have it if you buy equipment. If you don't buy equipment they would subtract it, right?
A. I'm not sure how they ...
Q. You don't know what that meant?
A. No. 518 plus should be about 618.
Q. Right. Which is the one in the next contract is 618.
A. Yes.
Q. There's no connection between that 618 and the one before?
A. No, there shouldn't be.
Q. So you don't understand these numbers then?

PAGE 93

0093

A. Technically not.
Q. Well, actually?
A. Yes, I do understand they pay some money on top but I could not -- this is why I didn't sign them. There is some problem with this document. They told me they cannot clean between 4 to 6 hours per night. I have documents saying that they cannot, the work is done, I have a handwriting document from ICM told me they're going to take four to six hour per night to clean store. When they provide me with this document they said this is what I have to do, that's impossible these category can be done in four to six hours, that it takes double that amount.
Q. So you hired people to do it though?
A. We did not do them.
Q. You didn't do them?
A. Correct. We did not do it. We tried to do it as much as possible but I did not. That's why I got fired from them. It was disputed the task what they asking.
Q. So the gross amount on each of these pages at the top of that subcontract was, for example let's look, let's start again with the top one, C-4w.
A. A hundred dollars off that, this is what I got paid.

SHEET 23 PAGE 86

0086

A. Correct. That will answer your question about if my employees are legal or not.
Q. Okay.
A. There are all documented workers.
(Bakri Deposition Exhibit No. 10 marked for identification.)
Q. Take a look at Exhibit 10, which is Department D-6, and tell me what it is?
A. Yeah, this is a document of employee who signed if they're going to work for us.
Q. And the handwriting at the bottom is not part of the document?
A. No.
Q. So we're not talking about that then?
A. No.
Q. That's something written by the Department where it says "Contract entered into by workers at Rainbow Foods." That's correct, though, you had your Rainbow employees sign Exhibit 10?
A. Correct.
Q. Do you have signed copies of Exhibit 10?
A. I have to look for them.
Q. In our previous interview you indicated you had copies. Did you ever provide them?
A. I don't believe I did.

PAGE 87

0087

Q. So this one is unsigned?
A. Unsigned, yes.
Q. And it's purporting to make these individuals independent contractors, is that right?
A. Correct.
Q. And you'll try to provide those next week as well?
A. Yes.
Q. Signed copies.
(Bakri Deposition Exhibit No. 11 marked for identification.)
Q. Exhibit 11 is a package of documents, I believe they all relate to ICM. Will you take a look and see if that's correct?
A. Correct.
Q. And they are Department Exhibits C-3 through C-4s?
A. Correct.
Q. The first page I'll represent is a cover letter from ICM sent to the Department of Labor to the investigator. Now let's look at the documents within. This just summarizes the documents. Have you seen a document like the first one before on C-4a?
A. Yes.

PAGE 88

0088

Q. And what is that?
A. That document ICM provided me to sign, and we did not sign them.
Q. You never signed them?
A. No.
Q. Why not?
A. Because they putting too much, too much duties on the employee which not compensated for. That's not what I negotiated the contract with them.
Q. So you never agreed to them?
A. No. You can see my signature is not there.
Q. It's not there?
A. Correct.
Q. But they sent these to you week after week after week?
A. I told them I'm not going to sign them.
Q. But did they pay in accordance with these documents? Did they pay you in accordance?
A. No.
Q. No?
A. No.
Q. So the first document for February 25th, 2001?
A. No.
Q. It says, I'm sorry, I can't read that, is

PAGE 89

0089

it --
A. 915?
Q. Well, the bottom total on page --
A. No, it's 915. That's what they paid.
Q. Okay, thank you for that. Is that what you actually were paid?
A. Yes.
Q. So the figure on the right side is correct?
A. 915? Yes. This is what they pay but it's not what we agreed.
Q. They paid you less than you agreed?
A. Correct.
Q. And why is that?
A. They lied. They lied. They lied. 915, this is what they paid.
Q. Now the next one?
A. I'm sorry, minus hundred dollars, so they took a hundred dollars here.
Q. What was this hundred dollars here?
A. They said they providing equipment.
Q. So in effect they're charging you for the supplies?
A. Correct, and equipment. So 815.
Q. And then the next week was $620?
A. That's another store.

SHEET 22 PAGE 82

0082

Q. And that's her signature there?
A. Yes.
Q. So this certificate was incorporated August 24, 1998, is that right? Look at the next page, page 2.
A. Yes.
Q. I'm going to show you what we'll mark as Exhibit 7.
(Bakri Deposition Exhibit No. 7 marked for identification.)
Q. Can you tell me what this is?
A. This is name of employee that work for me.
Q. And social security numbers?
A. Correct.
Q. And this is being sent to ICM, is that right?
A. Correct.
Q. By your wife?
A. Correct.
Q. And all these people on the second page here worked for you?
A. Yes.
Q. What time was that, what period?
A. Between 2001, between January 28, 2001 and July 23rd, 2001.
Q. And this is a three-page document, Exhibit 7.

PAGE 83

0083

Whose handwriting is Exhibit 7 in?
A. That's my wife, LeAnne Bakri.
Q. Exhibit 8.
(Bakri Deposition Exhibit No. 8 marked for identification.)
A. Okay. Four to six-hour shifts written on the top of it.
Q. And whose handwriting is that?
A. LeAnne Bakri.
Q. And this is which store, which stores?
A. This I don't know.
Q. Is this Louisiana? It says on the bottom Louisiana personnel, but that's a different handwriting, correct?
A. Correct.
Q. So we don't know if that's part of the document?
A. No, this document is not my wife's writing.
Q. Do you know whether these were employees up here or down in Louisiana?
A. One, two, three, four, five, six, seven, eight, nine, ten, 11, 12, 13, 14, 15, 16, 17, 18, 19. Nineteen person for four hours, that seems to me too many. Some of them names down in Louisiana, yeah.
Q. Some of the names are from Louisiana?

PAGE 84

0084

A. Yeah. Jose Ortiz, this was spelled Ortiz, O-R-T-I-Z.
Q. And that's the Jose from before?
A. Um-hum. Juan, I cannot tell you this name. Kevin I know.
Q. Kevin Arango, A-R-A-N-G-O?
A. Um-hum.
Q. So these are Louisiana people then?
A. You asked me about Bruce, Bruce Hammond, he's the person who has the documents. He was a supervisor at the time when the stuff was stolen. This is his full name.
Q. From now on I'm going to try to remember to give you the list in our file as well so we can cross-reference it without looking everything up. So Exhibit 8 is D-4. We'll do a quick run-through, if I can do that, to make a list for the exhibits that are numbered.
A. These names are too many names for Louisiana, some of them are.
Q. Could it have been over time, different names?
A. They should not have total, maximum eight people.
Q. There shouldn't have been more than eight

PAGE 85

0085

people in Louisiana?
A. No. There's only four stores.
Q. Exhibit 6, the Articles of Incorporation, was a C-1 in the Department of Labor file. Exhibit 7 was Exhibit D-3 in the Department of Labor file. I guess I only missed two of them so that's not too bad at this point. I want you to look at what we'll mark --
MR. GROSSMAN: We're on 8?
COURT REPORTER: We're on 9.
A. This one reflects technically, Exhibit 8 should reflect the Louisiana employee.
MR. GROSSMAN: Right, Exhibit 8 was D-4.
(Bakri Deposition Exhibit No. 9 marked for identification.)
Q. So that's Louisiana employees but you don't know why there were so many?
A. Maybe all of them work some time, but they not all working at the same time.
Q. Exhibit 9 looks like photocopies of green cards and social security cards. Exhibit 9 is Department Exhibit D-5.
A. Same thing, this is Minnesota workers.
Q. So these are green cards and social security cards from Minnesota workers?

SHEET 21 PAGE 78

0078

that's what this case is about.
A. Um-hum.
Q. You did not keep records by hours?
A. No.
Q. I just want to make sure. So that answer on your answer is incorrect?
A. We did not. The employee should have their own hour records.
Q. And you would accept those hour records as accurate?
A. If they bring them, yes. But technically we don't, it's not going to benefit them.
Q. No, it's not to your benefit. You had a signed agreement with you and ICM, with either company and ICM out of Knoxville?
A. Um-hum.
Q. Who signed that agreement?
A. I did.
Q. And you had a signed agreement, a written agreement between Rainbow and ICM?
A. Between Rainbow and ICM? No, I don't.
Q. Who is Rod Slone?
A. Ron.
Q. Is it Ron or Rod?
A. Ron.

PAGE 79

0079

Q. R-O-N?
A. Um-hum.
Q. Who is Ron Slone?
A. He's the service director for the ICM.
Q. Did you have a signed contract with ICM?
A. (Nods head.)
Q. Yes, you said?
A. Yes, I did.
Q. Now it says you have a log that shows the work that's been done in each store.
A. Yes.
Q. Do you have that? Have you provided that?
A. I think I did, yes. I think I did.
Q. We have not received that log of all the work being done in all the stores.
A. You have not received that? Well, it's documented.
Q. You will provide that by Friday as well?
A. Yes.
Q. I want to go on the record that we, your responses to interrogatories and documents were due on the 17th of April and we have not received them.
A. April 17th? Why April 17th.
Q. Because 30 days -- maybe April 18th.
A. From?

PAGE 80

0080

Q. From March 17th.
A. It was March 17th?
Q. Yes. And we expect those to be received by this Friday.
A. Yes.
Q. All the records and answers we should have by Friday?
A. Correct. I bring them Monday morning here.
Q. So not by Friday?
A. Monday morning.
Q. The following Monday?
A. Yes, correct.
Q. Today is Monday so a week from today?
A. Correct.
Q. You'll bring them here a week from today?
A. Yes.
Q. Everything in the interrogatories and the request for production?
A. Yes. That will give me time over the weekend to work on it.
Q. Okay. You billed ICM every two weeks?
A. Yes.
Q. Were some of the companies billed every week?
A. No.
Q. I'm just going to go through a lot of

PAGE 81

0081

documents and we'll see what they tell us, okay, and if you recognize them or know anything about them. This is going to be Exhibit 6, which is Articles of Incorporation and related documents.
(Bakri Deposition Exhibit No. 6 marked for identification.)
Q. Article 6 is two pages related to Articles of Incorporation, is that correct?
A. Correct.
Q. This is the Articles of Incorporation for General Maintenance & Floor Service, Inc., is that right?
A. Correct.
Q. And who is the contact person on this document?
A. I am.
Q. And your wife as well?
A. I don't see my wife. Yes, I don't see my wife.
Q. Does it say Michael and LeAnne?
A. Okay, now I see LeAnne Bakri.
Q. And the incorporator is Fatme Hoteit?
A. Correct.
Q. That's your mother?
A. Yes.

SHEET 20 PAGE 74

0074

A. Yes.
Q. Any other stores?
A. No.
Q. I thought there were 12. I only listed 12. Are there any I'm missing?
A. You listed 12?
Q. Um-hum?
A. There were 12. Minnetonka closed down.
Q. Which one?
A. Minnetonka closed down.
Q. So they were all cleaned by the corporation before the change and then by you after the change?
A. Yes.
Q. Nothing changed, nothing really changed?
A. Little bit minor change. Actually they add up, we went up to 20 store. On 2001 I did about 20 stores.
Q. 20 stores in 2001?
A. 2001, January 2001.
Q. From January until?
A. July.
Q. Until July you did 20 stores?
A. 20.
Q. So it was about a hundred dollars a store then, too?

PAGE 75

0075

A. About that, yes.
Q. Did General Maintenance, Inc. pay for workers' comp coverage?
A. No.
Q. They had no workers' comp?
A. No.
Q. Who took care of workers' comp?
A. Usually I did. If something happened I did. Nothing happened.
Q. Did you carry workers' comp later when you were in charge? What about workers' comp with Farmers Insurance?
A. I purchased some insurance, I'm not sure what it was. I purchased what they required for me, that company.
MR. GROSSMAN: Should we take a little break? Let's take a break.
(Break taken from 2:15 to 2:23 p.m.)
BY MR. GROSSMAN:
Q. Looking back again at the Exhibit 5, the declaration, and looking at paragraph 3?
A. Page?
Q. Page 3, paragraph F. You denied those allegations, if you look at Exhibit 4, you denied?
A. There were records, I believe there were

PAGE 76

0076

records kept.
Q. You said there were not in your answer. So is that incorrect then?
A. "During period since March Defendant failed to make, keep and preserve records." We did not fail. There were records.
Q. There were records?
A. It said failed.
Q. There were records of the hours?
A. No, not hours, a night.
Q. Okay. So there were no records of the hours, right?
A. No.
Q. So this answer is correct, you agree that there were no records of the hours, is that right?
A. Correct.
Q. So F should be agrees, not denies, or admits, right? You kept some records but not records of the hours?
A. Correct. We're answering about failed to me. We did not fail.
Q. Well, you failed to make records of the wages, right?
A. No, we did.
Q. You made records of the wages. You failed to

PAGE 77

0077

make records of the hours?
A. Correct. You have to define, hours or night.
Q. All night, but the actual hours you kept no records?
A. No. There is no records of hours.
Q. Right. That's what this says.
A. Correct. But you know the night is measured per hour.
Q. I don't know what that means. What does that mean, the night is measured per hour? Is that what you said?
A. Yes, I mean the element of measuring the day or night is made by hour technically.
Q. What does that mean?
A. Day is 24 hours.
Q. Right.
A. And.
Q. And night?
A. The night is --
Q. 12 hours, right?
A. 12. And the working hour defined here is going to be about six hours.
Q. But you didn't record the actual hours?
A. No, don't have to.
Q. Well, you do actually, under the law, but

SHEET 19 PAGE 70

0070

starting number, this is minimum.
Q. Do you have records showing when you gave raises?
A. Not anymore. No. Very, very rarely they go to $65, $75 very rarely.
Q. Usually 60, right?
A. 60, 65, right. 64. Most of the time 64. Let's put it 64.
Q. 64?
A. 64, average 64. Starting at 60, but after 15 days they will get about 64.
Q. But you didn't pay overtime on either 60 or on 64 or on 70?
A. No, no, no, there is no overtime. Overtime is out of question.
Q. And they work six nights generally?
A. Six nights, correct. Out of the question. The money does not really pay unless I have to start paying my own pocket. That people pay me maybe hundred dollars a night, so I split it 40/60.
Q. But the store provides the cleaning equipment and the materials?
A. Correct.
Q. You don't pay any of that?
A. No, no, only labor.

PAGE 71

0071

Q. So your overhead is just recordkeeping?
A. Yeah, overhead and just the employees and that's it.
Q. Recordkeeping, like the records you turned over, right?
A. Record?
Q. When you get the 40 percent, that's your profit?
A. Yeah, about that.
Q. And what other expenses do you have besides the labor?
A. Nothing.
Q. Nothing?
A. Nothing.
Q. Just your wife's time to do the books?
A. It's nothing. About 12 store divide by person per night, $400 a week, $500 a week is what we get, you know, per store, per all of them together. That's not a lot really money.
Q. So it was about a hundred dollars a night per store?
A. About that.
Q. Gross, before the wages were paid?
A. Um-hum.
Q. And that goes back under General Maintenance,

PAGE 72

0072

too?
A. Yeah, it's the same. Actually drop a little bit. Yeah, keep it the same.
Q. It dropped?
A. Yeah, Rainbow dropped their contract with the contractor.
Q. So when did it go down?
A. Sometime 1999.
Q. So before that it was how much?
A. HiTech was the best I think. It was about maybe 120, 125.
Q. A night?
A. With HiTech.
Q. Per store?
A. Um-hum.
Q. Did it depend on the square footage of the store or was it the same?
A. The same. Depend on square footage per store. But average is about 43,000 Rainbow Food.
Q. So let me just see if I have the correct locations of the stores up here, okay?
A. Um-hum.
Q. There was Lagoon in Uptown Minneapolis?
A. Um-hum.
Q. Then there's St. Louis Park?

PAGE 73

0073

A. Um-hum.
Q. Eden Prairie?
A. Yeah.
Q. Rockford Road in Plymouth?
A. Yes.
Q. 6th Avenue in Plymouth?
A. Yes.
Q. Brooklyn Park?
A. Yes.
Q. Northtown in Blaine?
A. In the end, yes.
Q. University Avenue, St. Paul?
A. Yes.
Q. Apple Valley?
A. No, Apple Valley, I change it, different store. No.
Q. What did you have instead of Apple Valley?
A. I'm not sure what. Maybe Columbia Heights.
Q. What about Eagan?
A. No.
Q. E-A-G-A-N?
A. No, not Eagan, I don't have Eagan.
Q. West St. Paul?
A. At one time I have it for a while.
Q. Richfield?

SHEET 18 PAGE 66

0066

promise us to give us a lot of stores down there so we have double people to work until they have new stores. So one of them can go work there but that never ...
Q. Now when you had two people in a store in the south, how long did it take to finish a store?
A. Four hours.
Q. Four hours. They always got down in four hours?
A. Yes.
Q. But here it took how long?
A. Here it took about six. 43,000 square footage here. Sometimes they have two people. There is a lot, lot of time has two persons sometime in the store. Even up here.
Q. Is there any record that would show when you had two people and when you had one?
A. Used to be. Not now, no, I don't have any. Technically it would take about six hours to clean a store. Average Rainbow Food is 40,000 square footage, and an average person can make about 5 to 6,000 per hour, so you can arrive at the solution. 40,000 divided by 5. Yeah, five, six hours.
Q. 40,000 divided by 5, wouldn't that be about 8?

PAGE 67

0067

A. Excuse me?
Q. 40,000 divided by 5, wouldn't that be 8?
A. Well, this is the whole store now we're talking about, and then there is a lot of shelving.
Q. But is that correct, though?
A. Yeah, that's correct.
Q. 40,000 divided by 5 would be 8?
A. Yeah, but you minus the shelving and the decoration in the store, you end up being -- a quarter of that is shelving in the store. The sales floor is this, all of it (indicating).
Q. We can't see on the paper. You're drawing a big square?
A. Okay. This is the store.
Q. Right.
A. But the store is not empty space, the store have a shelving.
Q. Right.
A. You know.
Q. So you're drawing aisles?
A. Aisles, very long aisles. Actually cleaning between aisles, not the whole store.
Q. Wouldn't it be faster to clean it if there were no aisles at all and you just kind of move back and forth? You wouldn't have to get around the

PAGE 68

0068

shelves and under the edges of the shelves?
A. Not necessary.
Q. What kind of equipment did they use to clean the floors?
A. Floor scrubber.
Q. Power scrubbers?
A. They can give you very high data from manufacturer, tells you how many hour that scrubber can clean per night.
Q. These are hand-pushed?
A. Hand-pushed, self-propelled.
Q. Self-propelled, and they can go right up to the edge of the shelves?
A. Yeah, they can go between the shelves. Come back and turn, come back and turn, come back and turn.
Q. They don't ride them, they push them, right?
A. Push them. Automatic scrubbers, you know. They never, nobody can clean eight hours. Six hours at most, you know, usually. Take about six hours. We pay them $60 per night. Then you have the vegetables and freezer around the wall. And you have the display for, bread display and cash registers, you know. Technically two-third cleanable. Two-thirds of that square footage is cleanable area.

PAGE 69

0069

Q. How often did you visit the stores?
A. Once a month maybe.
Q. To watch them work or just to visit?
A. Once a month.
Q. Did you go in and watch them work?
A. Usually I go in if there's some problem.
Q. Did you go at night when they were working or during the day?
A. During the day.
Q. To talk to the store manager?
A. Yeah.
Q. So you didn't watch them work?
A. No.
Q. So you don't know from your personal knowledge how long it took to do the store?
A. I did it myself, it took me about five hours.
Q. So it took you five hours but you never watched them to see how long it took them?
A. No.
Q. You never timed them?
A. No.
Q. You just told them however long it took to do the store you paid them $60?
A. Correct. This is not necessarily a good number. This is starting number. $60, this is

SHEET 31 PAGE 118

0118

18? Oh, they're all over.
A. You know, I never received that. I don't do stripping and wax.
Q. Do you know anything about that?
A. No, that is nothing being done for me. This is not part of my contract. This is Louisiana.
Q. But you didn't do it?
A. No.
Q. This wasn't your work?
A. No. So does not relate to my operation.
(Bakri Deposition Exhibit No. 19 marked for identification.)
Q. Exhibit 19 is Department C-24 from ICM. What are these, do you know?
A. I believe this is HiTech paid for, every two weeks for store in Louisiana. This is what I used to get per week.
Q. Were they taking a discount of a thousand dollars every two weeks or every week?
A. Yes, they were taking a thousand dollars, technically it's illegal, from me.
Q. It was illegally?
A. Um-hum.
Q. Was it some kind of a kickback?
A. They charge my mother company for supplies

PAGE 119

0119

she took, you know, and they took it from me.
Q. So it's the same like the hundred dollars a store?
A. Correct.
Q. So the industry seems to do that?
A. Yeah, they take whatever they ...
Q. So you got the net amount on each of these?
A. Yeah, and I never got paid last week I worked there, and they took $8,000 from me. I don't want to sue him. He was good for me that time. So I didn't go after him. I could go after him technically but I don't. Usually I don't bite the hand that feeds.
Q. So this is weekly?
A. Biweekly, that number reflecting the 8,400.
Q. Yeah?
A. This is biweekly. If you take the square footage of the store in Louisiana, you multiply that by .26, you arrive to the billing of each store. Or we can add all total square footage, multiply by 1.26, which should come up to this number.
Q. I'm sorry?
A. Total square footage for all the stores.
Q. Square footage, okay.
A. Total square footage multiply by .26, we arrive to this point.

PAGE 120

0120

Q. Okay. But it varies from week to week?
A. I don't know why. Maybe one day off somebody won't show up.
Q. Is it by employee or by store?
A. Sometimes employee don't go so they take it from me, they don't pay.
Q. Did you invoice them?
A. Yes.
Q. I don't know if we have those invoices or not.
A. Sometimes we don't work the whole week. Sometimes -- I don't know why.
Q. I guess the 9,454 minus a thousand is the regular weekly rate and once in a while it was less, right? Or sometimes more?
A. Maybe we had some more store.
Q. It varies?
A. We have to see.
Q. They sent the check by UPS?
A. Yes.
(Bakri Deposition Exhibit No. 20 marked for identification.)
A. All these people working down there, yes.
Q. Down there, you mean Louisiana?
A. Um-hum, yes.

PAGE 121

0121

Q. Now this John Walters, did he work for you?
A. No, I don't know that name.
Q. But the other names worked down in Louisiana?
A. John Walters, I don't know that name.
Q. But all the others did?
A. Kevin, yes. I don't know that Charlie. I don't know that name, did not work. Maybe one week and done.
Q. So you don't know whether they worked?
A. Marco, I did not hire Marco, no. Marcio? No. Carlos? No. I don't know these people, too many people. Jose used to deal with them.
Q. So Jose would know?
A. I know Kevin, yes. Kevin, but all these names.
Q. How come you know Kevin especially?
A. Kevin?
Q. Um-hum.
A. Because I met him and he lived in that apartment with me. He came and lived in my apartment.
Q. Did he help you out in managing it down there?
A. For about a month.
Q. Then what happened?