UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

ELAINE L. CHAO, Secretary of Labor, United States Department of Labor,

Plaintiff,

v.

GENERAL MAINTENANCE & FLOOR SERVICE, INC and MICHAEL BAKRI, individually and d/b/a General Maintenance,

Defendants.

CIVIL NO. 01-2374 (JRT/JSM)

REPORT AND RECOMMENDATION

The above matter came before the undersigned United States Magistrate Judge upon plaintiff's Motion for Summary Judgment [Docket No. 72].

Leonard Grossman, Esq. appeared on behalf of plaintiff Elaine Chao. Defendant Michael Bakri appeared pro se.

This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. §636(b)(1)(B) and Local Rule 72.1(c). For the reasons discussed below, **IT IS RECOMMENDED THAT** plaintiff's Motion for Summary Judgment [Docket No. 72] be **GRANTED**.

## FACTUAL BACKGROUND

On December 26, 2001, Elaine Chao, Secretary of Labor, United States Department of Labor, ("DOL"), filed a complaint against General Maintenance & Floor Service, Inc. and Michael Bakri ("Bakri"), individually and d/b/a General Maintenance. [Docket No. 1]. On March 15, 2004, a default judgment was entered against General

Maintenance & Floor Service, Inc. in the amount of $67,386.37. [Docket Nos. 37, 40]. The only remaining defendant is Michael Bakri, individually and d/b/a General Maintenance.

Beginning in 1989, Fatme Hoteit, Bakri's mother, incorporated and managed General Maintenance & Floor Service, Inc., (the "corporation") which performed floor-cleaning services for Rainbow Foods grocery stores in the Minneapolis/St. Paul area. Bakri Dep., at 27-30. According to Bakri, he went to work for the corporation in 1997, it went out of existence in the summer of 2000 when his mother left the country, and then he ran the business himself, servicing stores in Minnesota and Louisiana. Bakri Dep., at 11-12, 14, 16, 19, 30, 33-34, 52-53; Motion for Summary Judgment Hearing Transcript ("SJ TR"), at 14, 16.[1] The DOL states, based upon its review of defendants' records, interviews with defendants' employees, interviews with others and other relevant information, that Bakri acted directly or indirectly for the corporation since March 1, 1999, and Bakri was also doing business under the name General Maintenance since that date. Declaration of Investigator Kristin Tout in Support of Plaintiff's Motion for Judgment by Default ("Investigator Decl."), at ¶¶ 3(b), (c).

When Bakri joined the corporation in 1997, he became the crew chief of the corporation. Bakri Dep., at 31. Bakri also testified that he was considered the manager of the corporation from 1997-2000 and that in this position he signed papers and checks, hired and paid workers, and told them where to work. Bakri Dep., at 30-31, 51, 53-54. In 2000, when Bakri's mother left the country, Bakri continued the business,

---

[1] At the summary judgment hearing, Bakri stated that the corporation was dissolved on January 28, 2001, and that General Maintenance commenced operations after that date. SJ TR at 14, 16.

working under some of the same contracts. Bakri Dep., at 31-32. Bakri did not notify contractors that he was changing the name of the business, never sent notice that the structure of the business had changed, and did not formally dissolve the corporation. Bakri Dep., at 31-33, 110-11. In addition, Bakri continued to use the corporation's checking account, pay bills in the name of the corporation, and use his mother's credit card for the operation of the business. Bakri Dep., at 126, 135-38. In essence, Bakri was responsible for the operation of the floor cleaning business before and after the corporation ceased doing business, and Bakri ran the business the same way after his mother left as he ran it when his mother owned the corporation. Bakri Dep., at 55-57.

Bakri subcontracted with companies, such as B.E.L., HiTech and Industrial Cleaning Management ("ICM"), which held contracts with the grocery stores to perform floor cleaning. Hearing Transcript of May 11, 2004 ("May 11, 2004 TR"), at 35-37.[2] Workers hired by Bakri did the floor cleaning. Bakri Dep., at 31. Bakri did not keep any records of the hours worked by the workers because he paid them "per clean"—for each shift worked. May 11, 2004 TR, at 26, 44; Bakri Dep., at 35; Declaration of Kristin Tout-Nava dated November 15, 2004 ("Tout-Nava Nov. 15, 2004 Decl.") ¶ 5. Workers earned $60-$64 per clean. Bakri Dep., at 147. Bakri withheld wages for the first pay period for some employees. Bakri Dep., at 41. Further, Bakri did not pay overtime. Bakri Dep., at 133. Bakri testified that the workers were independent contractors and not employees. Bakri Dep., at 87.[3]

---

2 At the May 11, 2004 hearing, this Court put Bakri under oath to answer the DOL's outstanding discovery requests. See May 11, 2004 TR, at 16-51.

3 Bakri contradicted his deposition testimony at the hearing on the Motion for Summary Judgment. At that hearing, Bakri stated to the Court that his workers were

Bakri stopped doing business altogether on July 23, 2001. Bakri Dep., at 18, 39.

During 1999 and 2000 Barki's revenue was $12,000 per week, or $624,000 per year. See May 11, 2004 TR, at 38. In the first half of 2001, Bakri testified that his gross revenue was $250,000 ($125,000 per quarter). Id. at 30, 33. However, despite this sworn testimony, following the summary judgment hearing, Bakri submitted a "Profit or Loss From Business" form that indicated that his gross receipts in 2001 were $214,876. Attachment to Bakri Untitled Document, dated Dec. 10, 2004.

The DOL conducted an investigation covering the period between March 1, 1999 and August 29, 2001, headed by Kristin Tout-Nava. In this investigation, the DOL examined the wages, hours, and other conditions and practices of employment maintained by the corporation and Bakri for the purpose of determining whether they had violated any of the provisions of the Fair Labor Standards Act ("FLSA"). Tout-Nava Nov. 15, 2004 Decl. ¶¶ 1-2. DOL investigators either interviewed or obtained survey responses from twenty-three people who worked for defendants in Louisiana and in Minnesota. Tout-Nava Nov. 15, 2004 Decl. ¶ 3; DOL's Post-Hearing Submission, Ex. 4 ("Redacted Interview Statements"). These workers reported working as many as seven days a week and up to ten hours a day, and sometimes more. Tout-Nava Nov. 15, 2004 Decl. ¶ 6; DOL's Post-Hearing Submission, Ex. 4 ("Redacted Interview

---

actually employees, not independent contractors. SJ TR at 22. Further, in his post-hearing submissions to the Court, he stated that his workers were employees. See Bakri Untitled Document, dated Dec. 10, 2004; Defendants Respond for Summary Judgment, dated December 12, 2004 ("Defs.' Dec. 12, 2004 Response").

Statements"). DOL investigators also interviewed Bakri who stated that employees were paid by the shift and not hourly. Tout-Nava Nov. 15, 2004 Decl. ¶¶ 4-5.[4]

Based on the DOL's entire investigation, Tout-Nava established a "profile workweek" in which workers in Minnesota worked on average 63 hours per week, and workers in Louisiana worked from 42 to 66 hours per week. Tout-Nava Nov. 15, 2004 Decl. ¶ 7. For the Minnesota workers, the workweek varied based on information regarding the first two weeks of work that many employees reported was never paid to them. Tout-Nava Nov. 15, 2004 Decl. ¶ 7. By establishing the profile workweek, Tout-Nava determined that $67,386.37 in unpaid minimum wage and overtime compensation was due 23 workers for the period between March 1, 1999 and August 29, 2001. Tout-Nava Nov. 15, 2004 Decl. ¶ 8; DOL's Post-Hearing Submission, Ex. 2 ("Summary of Back Wages (WH-56)"), Ex. 3 ("Wage Transcription and Computation Sheets (WH-55)").

The DOL brought this Motion for Summary Judgment asserting that there are no genuine disputes of material fact and therefore summary judgment should be granted. The DOL argued that the workers who performed floor cleaning services for the corporation and for Bakri, individually and d/b/a General Maintenance were employees within the meaning of the FLSA, and that Bakri, individually or d/b/a General Maintenance, was an employer and therefore liable for back wages for the entire investigation period of March 1999 through July 2001. The DOL also asserted that Bakri failed to keep records of hours worked by the workers, failed to pay some of the workers the minimum wage in some workweeks, and never paid overtime to the

[4] Bakri did not sign the summary of this interview. DOL's Post Hearing Submissions, Ex. 4 ("Redacted Interview Statements").

workers. Based on this conduct, the DOL is seeking back wages and overtime pay from March 1999 through July 2001 in the amount of $67,386.37 and liquidated damages equal to this amount. See Investigator Decl., ¶¶ 3(d), (e), (g), Ex. A.

Bakri did not submit any affidavits, exhibits or memorandum in opposition to the DOL's Motion for Summary Judgment. However, after the hearing on the motion, Bakri submitted two similar responses to the motion and provided the Court with various exhibits.[5] In both responses, Bakri asserted that there were genuine disputes of material facts, he denied that he or the corporation violated the FLSA, and he denied that he owed any workers unpaid minimum wages or overtime pay. Bakri Untitled Document, dated Dec. 10, 2004; Defs.' Dec. 12, 2004 Response. Further, Bakri stated that his employees worked six days per week, seven hours per day for a total of 42 hours per week, that he paid the workers $350-400 per week, and that such a payment exceeded the minimum wage and any over time. Bakri concluded his Decmeber 12, 2004 submission, by requesting that his oral testimony at the summary judgment hearing be considered part of the document. Defs.' Dec. 12, 2004 Response.

[5] At the hearing, Bakri was given until December 10, 2004 to provide evidence he wanted to submit in opposition to the motion. As Bakri had not provided any response to the DOL's motion prior to the hearing, the Court did not commit to consider this belated submission. See SJ TR, at 23, 32; L.R. 7.1(d). On December 10, 2004, the Court received from Bakri an untitled document ("Bakri Untitled Document, dated Dec. 10, 2004"). On December 13, 2004, the Court received by facsimile Defendants Respond For Summary Judgment, dated December 12, 2004 ("Defs.' Dec. 12, 2004 Response"). In the December 10, 2004 submission, Barki requested an extension (but did not state for what), because he would be out of the country until March or April of 2005. Bakri Untitled Document, dated Dec. 10, 2004. The Court has considered both submissions in issuing this Report and Recommendation. No extension was granted by the Court to provide further information.

In the untitled document submitted on December 10, 2004 to the Court, Bakri stated that he worked as a subcontractor for ICM from December 2000 through June 2001 and no other person was affiliated with General Maintenance except for Bakri. Bakri Untitled Document, dated Dec. 10, 2004. Bakri then attached a copy of a form entitled "Profit or Loss from Business" for 2001, which he stated were his "Taxes/W2 for the year 2001"[6] and which he claimed showed how much he received from ICM.[7] Id. Bakri also stated that after reviewing the job work orders submitted by the DOL[8], he concluded that the papers had "been tampered, because no one worked more than 6 days a week." Id. In support of this claim, he performed the following calculations: "If you consider an employee working 6 days x 7 hours, as everyone took a 1-hour break each night, one total hours would be 42 hours per week. If you multiply 40 x $6.00 it totals $240.00 + 2 hrs. Overtime x $6.00[9] = $18.00. The total wages for the week would be $258.00 x 2 weeks = $516.00 total pay." Id. Bakri then stated that on the work order for the Blaine Rainbow store, which reflects "Mario" working seven days per week, there is a difference in the writing for the work order dated Monday, February 26, 2001, compared to the other work orders for Mario on that sheet. Id. Similarly, Bakri stated

6 At the May 11, 2004 hearing, Bakri stated that he had no copies of any tax forms for the years 1998-2002. May 11, 2004 TR, at 22.

7 There is no reference to ICM in this form, nor any indication that the form was part of Bakri's 2001 tax return. However, the form does indicate "gross receipts" for Bakri's cleaning business in the amount of $214,876.

8 Attached to the DOL's Summary Judgment motion as Exhibit 2 is a document entitled "ICM Job Work Orders (ICM 1 through ICM 15)." These are job work orders submitted by Bakri to ICM and obtained from ICM by the DOL, because Bakri stated that he had no copies of these records. These work orders showed arrival and departure times for each cleaner. May 11, 2004 TR, at 50.

9 It is believed that Bakri meant to use the figure $9.00.

that on the work order for the Woodbury Rainbow store, which reflects "Artemio" working seven days per week, there is a difference in the writing for Thursday, March 15, 2001, compared to the other work orders for Artemio on that sheet. Id. Bakri also attached checks for four of the individuals for whom the DOL had submitted work orders, which Bakri argued showed that they were paid more than minimum wage, even working a six-day workweek. Id. From those pay stubs, Bakri argued that he had demonstrated that the employees were paid more than minimum wage, paid overtime when necessary, and that he was not in violation of the law. Id.[10]

In response to Bakri's post-hearing submissions, the DOL argued that Bakri's submissions are insufficient to create a dispute with the evidence presented on behalf of the DOL. Specifically, the DOL asserted that most of Bakri's unsworn assertions are conclusions of law and not assertions of fact, and to the extent he asserted facts, they do not materially conflict with those presented by the DOL. For example, as to Bakri's W-2 submission that purports to show that Bakri's gross receipts from ICM in 2001 were $214,876, after noting that it was unsigned, the DOL argued that even assuming it accurately reflected the income of the business for the first half of 2001, when this figure

---

[10] The Court was not able to draw any conclusions from the work orders and checks provided by Bakri because the dates on these documents do not correspond. For example, Bakri attached the paycheck for Artemio for the pay period of March 3, 2001 through March 17, 2001, showing that he was paid $800, but the DOL's work orders for Artemio included the work weeks ending March 4, 2001 and March 18, 2001, which showed that Artemio worked 48 hours and 56 hours each week, respectively. The DOL's work orders did not include the week ending March 11, 2001 for Artemio. Similarly, Bakri attached the paycheck for "Angel" for the pay period of March 9, 2001 through March 22, 2001, showing that he was paid $620, but the only work order attached by the DOL for Angel was for the week ending April 1, 2001. Barkri attached the paycheck for "Israel" for the pay period of April 1, 2001 through April 14, 2001, showing that he was paid $350, and another pay stub showing he was paid $300 on May 3, 2001. However, the Court only has before it a work order for Israel for the week ending April 15, 2001.

was combined with the income of the enterprise in 2000, the business never dropped below $500,000 in annual dollar volume on a rolling quarter basis.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celeotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999). "[S]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327. "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" DePugh v. Smith, 880 F. Supp. 651, 656 (N. D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed. Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995). "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist

creating a genuine issue for trial." Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, *4-5 (D. Minn. 2003) (citations omitted). The non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy." Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995).

## DISCUSSION

In order to succeed on its motion for summary judgment against Bakri, the DOL must establish as a matter of law the following: that Bakri is an employer; that the cleaners who worked for him were employees and not independent contractors; that he is an enterprise; that he failed to pay his employees minimum wages in all weeks worked; that he failed to maintain records; and that he failed to pay overtime wages.

### A. Bakri was an Employer under the FLSA

The DOL argues that Bakri was continuously an employer from 1997 until he ceased operations in mid-2001. In this regard, the DOL asserts that Bakri ran the corporation because he hired, fired and trained most of the workers, as well as answered the phone, and made agreements and arrangements with various contracting companies regarding services to be performed by the floor cleaners he provided. Bakri Dep., at 52-55, 58, 59. The DOL further asserts that Bakri's role never changed, even after the corporation ceased to exist in the summer of 2000 and Bakri became a sole proprietor doing business as General Maintenance. As a sole proprietor, Bakri continued to run the business and used the corporate checking account and his mother's credit card in the operation of the business. Bakri Dep., at 33, 57, 126, 135-

38. In addition, Bakri never sent a notice to the companies with which he did business to inform them of any change in the business structure. Bakri Dep., at 110-11.

Bakri testified under oath that the workers were independent contractors and not employees. Bakri Dep. at 87. However, at the May 11, 2004 hearing Bakri referred to the individuals who cleaned for him as "employees," and at the following hearing on the DOL's Motion for Summary Judgment and in his post-hearing submissions, he admitted that the workers were employees. See e.g. May 11, 2004 TR, at 18, 20, 22, 24, 26, 27, 28, 30, 42; SJ TR at 22; Bakri Untitled Document, dated Dec. 10, 2004. Defs.' Dec. 12, 2004 Response.

Under the FSLA, an "Employer" is defined as follows:

> "Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.

29 U.S.C. § 203(d).

In order to determine whether an individual is an employer for purposes of the FSLA, the Eighth Circuit looks to "factors such as the control of hiring and firing of employees, control of the manner in which work is performed, and the fixing of employee wages." Dole v. Continental Cuisine, Inc., 751 F.Supp. 799, 802–03 (E.D. Ark. 1990) (citing Wirtz v. Pure Ice Company, 322 F.2d 259, 262-63 (8th Cir. 1963); Fruco Const. Co. v. McClelland, 192 F.2d 241, 244 (8th Cir. 1951)). Consequently, in Chambers Construction Co. v. Mitchell, 233 F. 2d 717, 724 (8th Cir. 1956), the Eighth Circuit found that the president and general manager of Chambers Construction was an employer under the FLSA because he was engaged in the active management of the

affairs of the corporation—as president and general manager he hired the supervisors and the home office force, their wages were subject to his control, and he had the ability to terminate the operations. Id.

Here, both as the manager of the corporation and as a sole proprietor, Bakri hired, fired and trained employees, told employees where to work, set employees' wages, controlled payroll, and terminated the business' operations. Under these undispued facts, the Court finds that Bakri was an employer under the FSLA

**B. Defendants are Covered by the FLSA**

"Enterprise" is given the following definition under the FLSA:

> "Enterprise engaged in commerce or in the production of goods for commerce" means an enterprise that—
>
> (A)(i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and
>
> (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated)

29 U.S.C. § 203(s)(1).

The DOL argues that Bakri has met the requirements under § 203(s)(1)(A)(i) of the FLSA because for the period of March 1, 1999 through July 1999, defendants' employees handled goods that moved through interstate commerce. In addition, Bakri has admitted that his employees handled supplies and materials originating outside of Minnesota. Bakri Dep., at 57-58.

As for the requirements under § 203(s)(1)(A)(ii) of the FLSA, relying on Barki's testimony under oath on May 11, 2004, the DOL asserts that Bakri's revenue during 1999 and 2000 was $12,000 per week, which totals $624,000 per year. See May 11, 2004 TR, at 38. Further, in the first half of 2001, Bakri testified that his gross revenues of $250,000 ($125,000 per quarter). Id. at 30, 33. According to the DOL, Bakri's testimony establishes that the annual dollar volume of the business continued at a rate of at least $500,000 per year throughout the period covered by this litigation, as a corporation and as a sole proprietorship.

Despite his testimony under oath on May 11, 2004, Bakri appears to dispute the amount of his gross revenues in the first half of 2001. After the summary judgment hearing, Bakri submitted a "Profit or Loss From Business" form that allegedly indicated that his gross receipts in 2001 were $214,876. Attachment to Bakri Untitled Document, dated Dec. 10, 2004.

To determine the annual dollar volume under the FLSA, the Court uses the "rolling quarters" method as set forth in 29 C.F.R. § 779.266, which provides:

> (b) In order to determine, when there may be doubt, whether an enterprise or establishment has an annual gross volume of sales made or business done in excess of the amount specified in the statute, and [sic] analysis will be made at the beginning of each quarter-year so that the employer will know whether or not the dollar volume tests have been met for the purpose of complying with the law in the workweeks ending in the current quarter-year. The total of the gross receipts from all its sales or business during a 12-month period which immediately precedes the quarter-year being tested will be the basis for analysis. When it is necessary to make a determination for enterprises or establishments which are operated on a calendar year basis for income tax or sales or other accounting purposes the quarter-year periods tested will coincide with the calendar quarters (January 1-March 31; April 1-June 30; July 1-September 30;

> October 1-December 31). On the other hand, where enterprises or establishments are operated on a fiscal year basis, which consists of an annual period different from the calendar year, the four quarters of the fiscal period will be used in lieu of calendar quarters in computing the annual volume. Once either basis has been adopted it must be used in making subsequent calculations. The sales records maintained as a result of the accounting procedures used for tax or other business purposes may be utilized in computing the annual dollar volume provided the same accounting procedure is used consistently and that such procedure accurately reflects the annual volume of sales or business.

29 CFR § 779.266(b). See Donovan v. 1-20 Motels, Inc., 664 F. 2d 957, 958 (5th Cir. 1981) (discussing the presumption under 29 C.F.R. § 779.266(a) that if an employer's business exceeds the dollar volume requirement in any calendar year, the business will be presumed to be covered in the next year unless the employer establishes through use of the rolling quarter method that its dollar volume for the previous twelve months has fallen below the $250,000 mark).[11]

Bakri does not dispute that in 1999 and 2000, defendants earned in excess of $500,000. To determine whether Bakri qualified as an enterprise under the FLSA for the period of January 1, 2001 through July 23, 2001 (when he ceased operations), under the rolling quarters method articulated by the Secretary of Labor, for the first quarter in 2001, the Court looks to Bakri's gross revenue for the preceding four quarters. See Donovan, 664 F. 2d at 958 (finding that the rolling quarter method is used to determine currently whether a business once covered by the Act continues to be subject to it, by calculating its annual dollar volume based on the sum of the four preceding quarters); see also Burnley v. Short, 730 F. 2d 136, 138 (4th Cir. 1984)

[11] In 1981, 29 U.S.C. § 203(s) only required that an enterprise generate annual gross volume sales or business of $250,000. The amount was raised to $500,000 in 1989. See Fair Labor Standards Act of 1989, Pub. L. No. 101-157, 103 Stat. 938.

("Under the rolling quarters method, an employer determines whether it is covered by the FLSA at the beginning of each quarter by calculating its annual dollar volume based on the sum of the four preceding quarters."). Based on Bakri's testimony that his gross revenue in 2000 was $12,000 per week, Bakri was governed by the FLSA for the first quarter of 2001 ($12,000 x 52 weeks = $624,000). To determine whether Bakri qualified as an enterprise under the FLSA for the second quarter of 2001, the gross revenue is calculated by adding the last three quarters of 2000 ($156,000 x 3 quarters = $468,000) to the first quarter of 2001 ($96,324).[12] Thus, the annual gross revenue as of the beginning of the second quarter is 564,324 ($468,000 + $96,324= $564,324). To determine whether Bakri qualified as an enterprise under the FLSA for the third quarter of 2001,[13] the gross revenue is calculated by adding the last two quarters of 2000 ($156,000 x 2 quarters = $312,000) to the first two quarters of 2001 ($192,648). The gross revenue as of the beginning of the third quarter is $504,648 ($312,000 + $192,648 = $504,648).

As all amounts are above the minimum $500,000 threshold dictated by 29 U.S.C. § 203(s)(1), this Court finds that Bakri was an enterprise engaged in commerce or in the production of goods for commerce throughout the period that the DOL is attempting to collect unpaid overtime and wages.

---

[12] Accepting Bakri's post-hearing submission that his revenues through July 23, 2001 (his last day of operation) were for $214,876, rather than his testimony that he had earned gross revenues of $250,000 for the first half of 2001, this Court divided that $214,876 by 29 weeks to arrive at a weekly revenue total of $7409.52. Thus, based on that calculation, his quarterly revenues for the first and second quarters of 2001, were $96,324 per quarter (13 weeks x $7409.52 per week).

[13] Because Bakri ceased operations on July 23, 2001, and the DOL is seeking relief through this date, the Court must calculate the revenues of the business for the third quarter.

**C. The Floor Cleaners were Employees under the FLSA**

The FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C.A. § 203(e)(1).

In Goldberg v. Whitaker House Co-op., 366 U.S. 28, 33 (1961), the Supreme Court stated that the "economic reality" of the relationship between the parties, rather than "technical concepts," should be the test of employment. The non-exhaustive factors in this "economic realities" test include:

> (1) the degree of control over the manner in which the work is performed; (2) the worker's opportunity for profit or loss depending on his managerial skill; (3) the worker's investment in equipment or materials, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree or permanence of the working relationship; and (6) whether the service rendered is an integral part of the employer's business.

Catani v. Chiodi, No. CIV. 00-1559(DWF/RLE), 2001 WL 920025, at *3 (D. Minn. Aug. 13, 2001) (citing Donovan v. DialAmerica, 757 F.2d 1376, 1382 (3rd Cir. 1985) (quoting Donovan v. Sureway Cleaners, 656 F.2d 1368 (9th Cir.1981)). Under the economic realities test, the Court considers "the totality of the circumstances, and not any one factor," to determine "whether a worker is the employee of a particular alleged employer." Catani, 2001 WL 920025, at *3 (citing Baystate Alternative Staffing, Inc. v. Herman, 163 F.3d 668, 675 (1st Cir.1998)).

The DOL argues that, taken as a whole, the factors clarify that the workers were employees and not independent contractors. This Court agrees. Bakri told workers which stores to work in and what work to do. The workers required little supervision and had no investment in equipment or materials. The workers had no opportunity for profit or loss and that the only source of income was their wages. The workers did not need

special skills to clean the floors. Lastly, it is evident that the work done by the workers was integral to Bakri's business—Bakri was in the business of providing floor-cleaning services and the only way those services could be provided was through the use of individuals who cleaned the floors.

Based on all these facts, and based on Bakri's admission at the motion for summary judgment and in his post-hearing submissions that the workers were employees, the Court finds that the floor cleaners were Bakri's employees.

**C. Defendants Did Not Keep the Records Required by the FLSA**

According to 29 U.S.C. § 211(c), employers are required to make, keep and preserve records of the wages and hours of their employees and other conditions and practices of employment. <u>See</u> 29 U.S.C. § 211(c). The regulations, at 29 C.F.R. 516(a) require employers to keep the following records:

> (5) Time of day and day of week on which the employee's workweek begins (or for employees employed under section 7(k) of the Act, the starting time and length of each employee's work period). If the employee is part of a workforce or employed in or by an establishment all of whose workers have a workweek beginning at the same time on the same day, a single notation of the time of the day and beginning day of the workweek for the whole workforce or establishment will suffice,
>
> . . .
>
> (7) Hours worked each workday and total hours worked each workweek (for purposes of this section, a "workday" is any fixed period of 24 consecutive hours and a "workweek" is any fixed and regularly recurring period of 7 consecutive workdays), . . .

29 C.F.R. 516(a)(5), (7).

The DOL argues that Bakri has failed to comply with 29 U.S.C. § 211(c) in his role as a manager for the corporation and as a sole proprietor. While Bakri stated that

many of his records were destroyed in a flood, he also admitted that he never kept records of the hours worked by the workers. May 11, 2004 TR, at 44.

Based on Bakri's admission that he never kept records of the hours worked by his workers, the Court finds that Bakri, as an employer, failed to comply with 29 U.S.C. § 211(c).

**D. Bakri Failed to Pay Overtime**

According to 29 U.S.C. § 207(a)(1), an employer must pay his employees overtime when they work more than forty hours per workweek. The statute provides, in pertinent part:

> (1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C.A. § 207(a)(1).

The DOL argues that Bakri failed to pay overtime wages to his workers. In this regard, the DOL asserts that Bakri, while stating that his workers should not have needed more than a few hours a night to complete their work, admitted that he had no way to establish the actual hours worked by the workers. May 11, 2004 TR, at 44-45. Bakri further admitted that he paid his workers by the shift and that they were not subject to any FLSA exemptions. May 11, 2004 TR, at 26, 42; Bakri Dep., at 35. Moreover, Bakri did not dispute records that revealed that workers had worked more than forty hours in a workweek in Louisiana. Bakri Dep., at 141.

Additionally, Bakri indicated that documents submitted to ICM, titled Job Work Orders, contained information on hours worked by his employees. May 11, 2004 TR, at 50. Some of those documents were insufficient to draw conclusions about Bakri's pay practices, but others established that workers regularly worked more than five days per week and more than forty hours per week. See DOL Ex. 2 (ICM Job Work Orders 1-2, 5-9). Based on this evidence and the fact that Bakri admitted to paying his workers by the shift and not by the hour, the DOL contends that Bakri has failed to pay overtime compensation required by the FLSA.

To determine the regular and overtime pay rate for an employee who is paid a flat sum, 29 C.F.R. § 778.112 provides the following:

> If the employee is paid a flat sum for a day's work or for doing a particular job, without regard to the number of hours worked in the day or at the job, and if he receives no other form of compensation for services, his regular rate is determined by totaling all the sums received at such day rates or job rates in the workweek and dividing by the total hours actually worked. He is then entitled to extra half-time pay at this rate for all hours worked in excess of 40 in the workweek.

29 C.F.R. § 778.112.

In this case, based on the DOL's entire investigation, including interviews of twenty-three employees, Tout-Nava established a profile workweek for Minnesota workers of 63 hours per week and a flat sum payment of $420 per week. See Tout-Nava Nov. 15, 2004 Decl. ¶ 3, 6, 7; DOL Post-Hearing Submission, Ex. 3 ("Wage Transcription and Computation Sheets"), Ex. 4 ("Redacted Interview Statements"). Applying 29 C.F.R. § 778.112, a Minnesota employee who worked a 63-hour week at $420 would be entitled to a regular rate of $6.67 ($420/63 = $6.67). An employee would then be entitled to extra half-time pay of $3.335 ($6.67/2 = $3.335) for any hours

worked in excess of 40 hours in the workweek. For the 23 overtime hours (63 hours work – 40 hours in the workweek = 23 overtime hours) worked by Minnesota employees, Bakri owed them an additional $76.71 (23 overtime hours x $3.335 addition overtime pay rate). DOL Post-Hearing Submission, Ex. 3 ("Wage Transcription and Computation Sheets"). The same process was used for the employees in Louisiana. Id. Based on these calculations, the DOL computed that Bakri owes 23 employees a total of $67,386.37 in unpaid regular pay and overtime pay. See Tout-Nava Nov. 15, 2004 Decl. ¶ 8.

In conjunction with the summary judgment hearing, Bakri contradicted his sworn testimony that he paid his workers by the shift and that he did not keep track of hours worked by these individuals. In this regard, Bakri asserted that he paid his workers $6.00 per hour for forty hours per week and $9.00 per hour for the hours worked in excess of forty hours per week. SJ TR, at 22. Further, in his post-hearing submissions, Bakri stated that workers worked six days per week, seven hours per day for a total of 42 hours per week. Bakri stated that he paid the workers $350-400 per week, and such a payment exceeds the minimum wage and any overtime. Defs.' Dec. 12, 2004 Response. However, Bakri did not present any evidence to support any of these statements.[14]

The Court concludes that Bakri failed to comply with 29 U.S.C. § 207(a)(1) because he failed to pay his workers overtime pay. Bakri's unsupported assertion that he paid his workers $9.00 per hour as overtime pay does not create a factual dispute to deny summary judgment. First, he failed to "substantiate his allegations with sufficient

---

[14] While Bakri attached three checks and a pay stub, these documents do not provide any evidence to support Bakri's contentions.

probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy," Wilson v. Int'l Bus. Mach. Corp., 62 F.3d at 241. Second, Bakri cannot contradict his sworn testimony to create an issue of material fact for the purpose of evading summary judgment. Cf. Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361 (8th Cir. 1983) (an affidavit submitted in connection with a motion for summary judgment does not create an issue of material fact where it conflicts with a previous deposition and did not contain an explanation as to the contradictions); see also Adelman-Tremblay v. Jewel Cos., 859 F.2d 517 (7th Cir. 1988) (holding that a party could not avoid summary judgment by submitting supplemental affidavits of expert witnesses that conflicted with earlier deposition testimony).

Based on the undisputed evidence presented by the DOL, Bakri's employees regularly worked more than forty hours per week. Therefore, the Court finds as a matter of law that Bakri failed to comply with 29 U.S.C. § 207(a)(1).

**E. Bakri Failed to Pay Minimum Wages in all Weeks Worked**

According to 29 U.S.C. § 206(a)(1), an employer must pay his employees at least the minimum wage of $5.15 per hour. The statutes provides in pertinent part:

> (a) Employees engaged in commerce; home workers in Puerto Rico and Virgin Islands; employees in American Samoa; seamen on American vessels; agricultural employees
>
> Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:
>
> (1) except as otherwise provided in this section, not less than $4.25 an hour during the period ending on September 30, 1996, not less than $4.75 an hour during the year

> beginning on October 1, 1996, and not less than $5.15 an hour beginning September 1, 1997.

29 U.S.C. § 206(a)(1).

The DOL argues that Bakri violated the minimum wage provision of the FLSA because he failed to pay wages when they became due, or in some instances failed to pay the workers at all. In this regard, the DOL asserts that the basic shift rate paid by Bakri was sufficient to meet the minimum wage in most weeks; however, the record indicates that Bakri frequently withheld the pay for the first pay period. See Tout-Nava Nov. 15, 2004 Decl., ¶ 7; DOL Post-Hearing Submission, Ex. 4 ("Redacted Interview Statements": B-1b (starting week), B-1d, B-2c, B-3a (first pay period), B-7e, B-8d, B-9d (starting weeks), B-10c (last pay), B-11c (starting pay), B-14a, B-16b, B-17b, B-18c, B-18i, B-18j, B-19c, B-20b, B-21c, B-22 (starting pay), B-23d, B-25a).[15] Further, the DOL argues that wages must be paid when due, not weeks or months later, and that Bakri has not provided any records establishing that he ever did pay the withheld amounts. Bakri admitted to withholding first pay period wages, but testified that the wages were paid when the worker left the job. Bakri Dep., at 41.

Based on the Declaration of Kristin Tout-Nava, DOL Post-Hearing Submission, Ex. 4 ("Redacted Interview Statements") and Bakri's failure to present the Court with any admissible evidence to create a genuine issue at trial, the Court finds that, in some

[15] One worker testified that Bakri owes him for 36 days of work. DOL Post-Hearing Submission, Ex. 4 ("Redacted Interview Statements"), at B-1b. Kevin Arango stated that he knew some people who Bakri never paid because they only worked a week or less. Id., at B-3a. Another worker indicated that Bakri owed him for three days of work plus another "two weeks 23 evenings." Id., at B-7e. Exhibit 4 is replete with examples where Bakri failed to pay his workers.

instances, Bakri failed to pay wages when they became due, or failed to pay the workers at all.

### F. Back Wages

The DOL argues that because Bakri has failed to maintain records of all hours worked by his workers, the Court should accept Kristin Tout-Nava's findings, which indicate that Bakri owed $67,286.37 in unpaid minimum wage and overtime compensation. The DOL asserts that even though the ICM documents it received are incomplete, they establish that workers regularly worked more than 40 hours per week. Further, the DOL asserts that Bakri has admitted that he did not keep hours records, that he withheld first pay period earnings and that he did not pay workers on an hourly basis.

An employee who brings a claim under the FLSA for unpaid minimum wages and overtime has the burden of proving that he performed work for which he was not properly compensated. Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946). However, employers have the duty to make, keep and preserve records of the wages and hours of their employees. See 29 U.S.C. § 211(c). Considering both requirements, the Supreme Court addressed the situation where an employer kept inadequate records and the employee was unable to produce a convincing substitute, as follows:

> When the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated

> work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

Anderson, 328 U.S. at 687-88; see also Hearnsberger v. Gillespie, 435 F.2d 926, 931-32 (8th Cir. 1970). This rule applies where an employee has proved that he has performed the work and has not been paid in accordance with the FLSA. Anderson, 328 U.S. at 688. In such a case, damage is certain, and uncertainty lies in the amount of damages. Id.; see also Sharp v. Warner Holding Co., No. 4-71-Civ. 18, 1972 WL 1064, at *2 (D. Minn. Nov. 10, 1972) ("The 'just and reasonable inference' test applies only to the question of whether plaintiffs have shown with sufficient certainty the amount of overtime worked.").

The Court finds that the DOL has carried out its burden on behalf of the employees because it has shown that they have in fact performed work for which they were improperly compensated. See DOL Post-Hearing Submission, Ex. 4 ("Redacted Interview Statements"). Further, the DOL, on behalf of the employees, has produced sufficient evidence, through the interview statements, to show the amount and extent of the work completed to make a just and reasonable inference. The burden then shifted to

Bakri to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the DOL's evidence. Bakri failed to produce any such evidence, and therefore, based on the undisputed evidence the Court recommends the acceptance of the investigator's presentation of $67,386.37 in back wages due. See DOL Post-Hearing Submission, Ex. 2 (Summary of Back Wages (WH-56).

### G. Plaintiff is Entitled to Liquidated Damages

According to 29 U.S.C. § 216(b), employees may recover liquidated damages in the amount equal to the amount of unpaid minimum wages and overtime compensation. The statute provides, in pertinent part:

> Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

29 U.S.C. § 216(b).

FLSA's liquidated damages provision is "intended in part to compensate employees for the delay in payment of wages owed under the FLSA; it is a penalty or a punishment." Hultgren v. County of Lancaster, 913 F.2d 498, 509 (8th Cir. 1990). "An award of liquidated damages under section 216(b) is mandatory unless the employer can show good faith and reasonable grounds for believing that it was not in violation of the FLSA." Braswell v. City of El Dorado, 187 F.3d 954, 957 (8th Cir. 1999) (citing Hultgren, 913 F.2d at 509). The Portal-to-Portal Act provides, in pertinent part:

> [I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that

> his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

29 U.S.C.A. § 260. The employer bears the "affirmative burden to show both subjective good faith and objective reasonable grounds for belief of compliance." Jarrett v. ERC Properties, Inc., 211 F.3d 1078, 1084 (8th Cir. 2000)(citing McKee v. Bi-State Dev. Agency, 801 F.2d 1014, 1020 (8th Cir. 1986).

The DOL argues that Bakri can show no good faith basis for failing to pay his workers the minimum wage and overtime compensation required by the FLSA, and therefore liquidated damages in an amount equal to the back wages are appropriate.

The Court agrees. Bakri has not even attempted to meet his burden of showing both subjective good faith and objective reasonable grounds for belief of compliance. Therefore, the Court recommends that Bakri pay liquidated damages to the employees affected in the amount equal to their unpaid minimum wages and unpaid overtime compensation.

## RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein, **IT IS RECOMMENDED THAT** plaintiff's Motion for Summary Judgment [Docket No. 30] be **GRANTED** in all respects. Specifically, it is recommended that Bakri pay to the plaintiff $67,386.37 in unpaid wage and overtime compensation due workers for the period between March 1, 1999 and August 29, 2001, and that he pay liquidated damages in the amount of $67,386.37.

Dated: July 27, 2005

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **August 15, 2005** a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **August 15, 2005**.